1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                  **FOR THE DISTRICT OF ARIZONA**

8

9    Ronald Dwight Schackart,              No. CV-03-00287-TUC-DCB

10                   Petitioner,            <u>DEATH-PENALTY CASE</u>

11   v.                                     **ORDER**

12   David Shinn, et al.,

13                   Respondents.

14         Petitioner Ronald Dwight Schackart is an Arizona death row inmate. He seeks

15   reconsideration of Claim 6(b) of his federal habeas petition, which alleges trial counsel was

16   ineffective at sentencing for failing to "[r]equest a mitigation specialist or other trained and

17   expert person to do a thorough investigation of Schackart's dysfunctional family origin and

18   mental health status." (Doc. 131, (Supp. Brief), at 11) (quoting Doc. 39 (Petition) at 31–

19   32.) Because Schackart did not raise this allegation in state court, this Court found the claim

20   procedurally defaulted and barred from federal review. (Doc. 75 at 16–17, 56.) The Ninth

21   Circuit has directed the Court to reconsider that ruling in light of intervening law, including

22   *Martinez v. Ryan*, 566 U.S. 1 (2012). (Doc. 125.)

23   **I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

24         On March 8, 1984, Schackart and a female friend, Charla Ryan, met for lunch to

25   discuss his recent problems.[1] Upon discharge from the Army in July 1983, (*see* Doc. 131-

26

27         ───────────────

           [1] Except where otherwise indicated, this factual summary is taken from the Arizona

28   Supreme Court opinion affirming Schackart's conviction. *State v. Schackart (Schackart I)*,
     175 Ariz. 494, 496–497, 858 P.2d 639, 641–42 (Ariz. 1993).

1, Ex. 1 at 2), Schackart had allegedly returned home to find his wife, Alyda Pajkos, in bed with a man. Schackart also had been charged with sexually assaulting his wife, an accusation he denied. He was out of work and needed a place to stay. Charla agreed to drive Schackart to a Holiday Inn so he could rent a room. After talking for a while in the room, Schackart became upset thinking about his wife and, as he later contended, began confusing her with Charla. He pulled a gun out and asked Charla if she would have sex with him. After she refused, he forced her to comply at gunpoint. The two remained in the room for several hours. Schackart struck her on the neck with the gun butt when she appeared to be sleeping, allegedly to knock her out. The blow did not render her unconscious. Instead, she awoke and began screaming. Schackart then strangled her.

That evening he confessed to his pastor and his parents that he had killed a woman. He later confessed to police that he had sexually assaulted and killed the victim. Police found the victim where Schackart indicated, in a room at the Holiday Inn. Her body was under the covers on the bed and a large sock had been stuffed in her mouth. Subsequent medical examination revealed that she died of manual strangulation and that the sock had been stuffed in her mouth with sufficient force to tear the base of her tongue.

Schackart was prosecuted for first-degree murder, kidnapping, and sexual assault. Pima County Superior Court Judge Michael Brown presided over the trial and sentencing. Assistant Pima County Public Defenders Donald Klein and Karen Noble represented Schackart at trial. (*See* ROA at 16, 19, 33.)[2] On the second day of trial, acting against his

---

[2] "RT" refers to reporter's transcript. "ROA" refers to the Bates-stamped numbers in the eight-volume record on appeal from trial and sentencing prepared for Schackart's direct appeal to the Arizona Supreme Court (Case No. CR-93-0535-AP) (Volumes I-B through VII). "Resentencing ROA" refers to the Bates-stamped numbers in the one-volume record on appeal from the resentencing prepared for Schackart's second direct appeal to the Arizona Supreme Court (Case No. CR 93-0535-AP) (Volume I-A). "Supp-ROA" refers to the Bates-stamped numbers in the two-volume supplement of record on appeal (Volumes Unlabeled, filed April 25, 1994, and November 25, 1994). "PCR ROA" refers to the documents contained in the seven-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-02-0344-PC). "PR Doc." refers to the Arizona Supreme Court's docket for Schackart's petition for review of that case to the Arizona Supreme Court. The original

counsel's advice, Schackart sought to dismiss his counsel and plead guilty. (RT 3/13/85 at 2–3; ROA 453–54.) The case proceeded to trial with counsel after Schackart failed to admit a sufficient factual basis for the plea. (RT 3/13/85 at 17–34; ROA 456); *State v. Schackart (Schackart I)*, 175 Ariz. 494, 497, 858 P.2d 639, 642 (Ariz. 1993).

On March 16, 1985, a jury convicted Schackart of all charges and further found that Schackart intended to kill the victim. (ROA 490, 589); *Schackart I*, 175 Ariz. at 497, 858 P.2d at 642. Schackart waived counsel and represented himself during sentencing, with Klein and Noble acting as advisory counsel. (RT 3/27/85 at 4–6.) Judge Brown sentenced Schackart to death for the murder and to a term of years for the other counts.[3] (ROA at 830, 838.)

The Arizona Supreme Court affirmed the convictions for all three crimes and the sentences for sexual assault and kidnapping. *Schackart I*, 175 Ariz. at 503, 858 P.2d at 648. The court vacated the death sentence and remanded for a new sentencing hearing because the sentencing transcript was inadequate for review. *Id.* at 499, 858 P.2d at 644. Schackart's allocution and the statement of his defense counsel had not been transcribed. *Id.* The court noted, however, that the aggravation/mitigation hearing had been transcribed in full and was sufficient for review. *Id.*

After remand, Schackart was again sentenced to death for the first-degree murder conviction. (Resentencing ROA at 115.) The trial court concluded that the State had established the aggravating circumstances of a prior conviction of a violent felony under A.R.S. § 13-703(F)(2)[4] and that the murder was cruel, heinous or depraved under A.R.S. §

reporter's transcripts and certified copies of the trial and postconviction records were provided to this Court by the Arizona Supreme Court on November 18, 2004. (Docs. 66, 67.)

[3] At the time of Schackart's trial, Arizona law required trial judges to make all factual findings relevant to the death penalty and to determine the sentence. Following the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), which held that a jury must determine the existence of facts rendering a defendant eligible for the death penalty, Arizona's sentencing scheme was amended to provide for jury determination of eligibility factors, mitigating circumstances, and sentence.

[4] Section 13-703 has been renumbered as § 13-751. The Court uses the version in

13-703(F)(6). *State v. Schackart (Schackart II)*, 190 Ariz. 238, 245, 947 P.2d 315, 322 (Ariz. 1997).

On direct review, the Arizona Supreme Court struck the aggravating circumstance of Schackart's prior violent crime, but again found the crime was committed in an especially cruel manner and affirmed the death sentence after reweighing the remaining aggravating circumstance and the mitigation. *Id.* at 251, 258 & 260–61, 947 P.2d at 328, 335 & 337–38. The court explained that the trial court's cruelty finding was appropriate because:

> The length of time Charla was held in the motel room, the presence of a gun, the sexual assault, the discussion about tying her up or drugging her, the blow to her head, the strangling, and her inevitable uncertainty about her ultimate fate all support the court's finding that this murder was especially cruel.

*Id.* at 248, 947 P.2d at 325.

The court rejected the trial court's finding that the murder was also heinous or depraved because the record did not support a finding that Schackart relished the murder, that he inflicted unnecessary and gratuitous violence upon the victim, or that the killing was needless and unnecessary. *Id.* at 250, 947 P.2d at 327.

After counsel was appointed to represent Schackart in post-conviction relief (PCR) proceedings, the court granted Schackart's subsequent motion to permit "hybrid representation," making him "co-counsel."[5] (PCR ROA 2, 32, 35.) Schackart filed a PCR petition with the trial court and a subsequent addendum. (PCR ROA 166, 167.) After Judge Brown retired, the case was assigned to Pima County Superior Court Judge Jan Kearney. (*See* PCR ROA 161.) The PCR petition was denied without a hearing. (PCR ROA 185.) The Arizona Supreme Court summarily denied Schackart's petition for review on May 28, 2003. (PR 26.)

---

effect at the time of the murder.

[5] In Arizona, hybrid representation occurs when a defendant concurrently represents himself and is represented by counsel. *State v. Murray*, 184 Ariz. 9, 27, 906 P.2d 542, 561 (1995). There is no constitutional or other right to hybrid representation; it is disfavored but permissible under Arizona law. *Id.*

Schackart filed a preliminary Petition for Writ of Habeas Corpus in this Court on May 30, 2003, and an amended petition on May 3, 2004. (Docs. 1, 39.) Schackart asserted an ineffective assistance of trial counsel claim based on counsel's failure to request "a mitigation specialist or other trained and expert person to do a thorough investigation of Schackart's dysfunctional family origin and mental health status." (Petition at 31–32.)

The Court found the claim procedurally defaulted because it had never been fairly presented to the state courts. (Doc. 75 at 16–17.) Based on then-controlling law, the Court rejected Schackart's allegation that the ineffective assistance of his PCR counsel established cause for the default and dismissed the claim as procedurally barred. (*Id.* at 17.) On March 17, 2009, the Court denied Schackart's Amended Petition in its entirety. (Doc. 103 at 28.)

While Schackart's appeal from this Court's denial of habeas relief was pending, the Supreme Court decided *Martinez v. Ryan*, which held that where ineffective assistance of counsel (IAC) claims must be raised in an initial PCR proceeding, failure of counsel in that proceeding to raise a substantial trial IAC claim may provide cause to excuse the claim's procedural default. 566 U.S. at 17. Subsequently, Schackart moved the Ninth Circuit to stay his appeal and remand Claim 6(b).

The Ninth Circuit granted Schackart's motion for a limited remand, ordering the district court to reconsider Claim 6(b) in light of intervening law. (Doc. 125) (citing *Martinez*, 566 U.S. 1; *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc); *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc)).

This Court ordered supplemental briefing to address whether cause exists under *Martinez* to excuse the procedural default of the claim and whether Schackart is entitled to habeas relief under 28 U.S.C. § 2254. (Doc. 126.) Schackart argues that post-conviction counsel acted ineffectively in litigating claims against sentencing counsel in state court, and requests evidentiary development and an evidentiary hearing to prove both "cause" under *Martinez* and the merits of Claim 6(b). (Supp. Brief.) Schackart also requests evidentiary development under Rules 6, 7 and 8 of the Rules Governing Section 2254

- 5 -

Cases.[6] Respondents have filed a response, and Schackart filed a reply. (Docs. 141 (Supp. Response), 144 (Supp. Reply).)

## II. APPLICABLE LAW

### A. *Martinez v. Ryan*

Federal review is generally unavailable for a claim that has been procedurally defaulted. In such situations, review is barred unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice that excuses the default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). *Coleman* held that ineffective assistance of counsel in post-conviction proceedings cannot establish cause for a claim's procedural default. *Id.*

In *Martinez*, the Supreme Court announced a new, "narrow exception" to that rule. The Court explained that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17; *see also Trevino v. Thaler*, 569 U.S. 413, 418 (2013).

Accordingly, under *Martinez* an Arizona habeas petitioner may establish cause and prejudice for the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that (1) PCR counsel was ineffective and (2) the underlying ineffective assistance claim has some merit. *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 14; *Atwood v. Ryan*, 870 F.3d, 1033, 1059–60 (9th Cir. 2017)).

To establish "cause" under *Martinez*, a petitioner must demonstrate that PCR counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015). *Strickland* requires a demonstration "that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable

---

[6] As discussed in greater detail below, the Court expands the record to consider the new evidence developed by Schackart during these habeas proceedings (Doc. 131-1, Supplemental Exhibits 1–9) in support of the defaulted claims.

probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Id.* at 377 (citation omitted).[7]

To establish "prejudice" under the second prong of *Martinez*'s "cause and prejudice" analysis, a petitioner must demonstrate that his underlying ineffective assistance of trial counsel claim is "substantial." *Id.* In *Martinez*, the Supreme Court defined a "substantial" claim as a claim that "has some merit," noting that the procedural default of a claim will not be excused if the IAC claim "is insubstantial, i.e., it does not have any merit or . . . it is wholly without factual support." *Martinez*, 566 U.S. at 14–16.

The standard for finding a claim "substantial" is analogous to the standard for issuing a certificate of appealability. *Id.* at 14; *see Detrich*, 740 F.3d at 1245. Under that standard, a claim is "substantial" if "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* (citing *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)).

A finding of "prejudice" for purposes of the "cause and prejudice" analysis, which requires only a showing that the underlying claim of ineffective assistance of trial counsel is substantial, "does not diminish the requirement . . . that petitioner satisfy the 'prejudice' prong under *Strickland* in establishing ineffective assistance by post-conviction counsel." *Clabourne*, 745 F.3d at 377.

The Ninth Circuit has offered guidance in assessing whether "cause" exists under *Martinez*. In *Atwood*, for example, the court explained:

> In evaluating whether the failure to raise a substantial claim of ineffective assistance of trial counsel in state court resulted from ineffective assistance of *state habeas* counsel under *Strickland*, we must evaluate the strength of

---

[7] Schackart argues that to establish "cause," he need only show deficient performance by state post-conviction counsel resulted in the default of a "substantial" claim of ineffective assistance of trial counsel. (Supp Brief at 9.) The Ninth Circuit, however, has "consistently . . . reaffirmed the *Clabourne* framework, which requires a petitioner to establish "cause" by showing *Strickland* prejudice." *Hooper v. Shinn*, 985 F.3d 594, 627 & n.29 (9th Cir. 2021) (citing *Rodney v. Filson*, 916 F.3d 1254, 1260 & n.2 (9th Cir. 2019)).

the prisoner's underlying ineffective assistance of *trial* counsel claim. If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it. Further, any deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised.

870 F.3d at 1059–60; *Hooper v. Shinn*, 985 F.3d 594, 627 (9th Cir. 2021); *see Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective.").

In *Runningeagle v. Ryan*, 825 F.3d 970 (9th Cir. 2016), the court addressed the standard necessary to find PCR counsel's performance prejudicial. The court explained that under *Martinez*:

Although the prejudice at issue is that in PCR proceedings, this is a recursive standard. It requires the reviewing court to assess trial counsel's as well as PCR counsel's performance. This is because, for us to find a reasonable probability that PCR counsel prejudiced a petitioner by failing to raise a trial-level IAC claim, we must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised.

*Id.* at 982; *see Murray v. Schriro*, 882 F.3d 778, 816 (9th Cir. 2018).

The *Martinez* exception to procedural default applies only to claims of ineffective assistance of trial counsel. It has not been expanded to other types of claims. *Martinez (Ernesto) v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019) ("[I]neffective assistance of PCR counsel can constitute cause only to overcome procedurally defaulted claims of ineffective assistance of trial counsel."); *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (noting that only the Supreme Court can expand the application of *Martinez* to other areas); *see Davila v. Davis*, 137 S. Ct. 2058, 2062–63, 2065–66 (2017) (holding that the *Martinez* exception does not apply to claims of

ineffective assistance of appellate counsel).[8]

### B.    Ineffective of assistance of counsel

Claims of ineffective assistance of counsel are governed by the principles set out in *Strickland*, 466 U.S. 668. To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88. The inquiry under *Strickland* is highly deferential. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 558 U.S. 15, 16–17 (2009) (per curiam). The "standard is necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89.

Deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove

---

[8] The Court therefore rejects Schackart's contention (*See* Supp. Brief at 18 n. 9) that the Court should address PCR counsel's failure to raise an ineffective assistance of appellate counsel claim for failure to appeal the trial court's denial of a mental health evaluation for mitigation. Schackart relies on the holding in *Nguyen v. Curry*, 736 F.3d 1287, 1292–93 (9th Cir. 2013) (extending the *Martinez* exception to Sixth Amendment ineffective assistance of appellate counsel claims) to support his contention, but *Nguyen* has since been abrogated by the Supreme Court's holding in *Davila*, 137 S. Ct. 2058.

prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. The petitioner "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams (Terry) v. Taylor*, 529 U.S. 362, 394 (2000)).

For claims of ineffective assistance of counsel at sentencing in capital cases, prejudice is assessed by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The "totality of available evidence" includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Id.* at 536 (quoting *Williams (Terry)*, 529 U.S. at 397–98). "If the difference between the evidence that could have been presented and that which actually was presented is sufficient to 'undermine confidence in the outcome' of the proceeding, the prejudice prong is satisfied." *Duncan v. Ornoski*, 528 F.3d 1222, 1240 (9th Cir. 2008) (quoting *Strickland*, 466 U.S. at 694).

## III.   SCOPE OF REVIEW

Respondents argue that Claim 6(b) is a narrow claim alleging counsel was ineffective only in failing to request a mitigation specialist. They argue Schackart is attempting to exceed the mandate by alleging a new claim of ineffective assistance of counsel for failing to conduct a mitigation investigation. (Supp. Response at 3–4.) The Court disagrees. The Ninth Circuit's remand order is not as narrow as Respondents assert.

The Ninth Circuit has "repeatedly held . . . that a district court is limited by this court's remand in situations where the scope of the remand is clear." *United States v. Thrasher*, 483 F.3d 977, 982–83 (9th Cir. 2007) (quoting *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1172 (9th Cir. 2006)). In *Thrasher* the Ninth Circuit held that the district court did not err in refusing to consider a new ineffective assistance of counsel argument based on evidence presented during a post-appeal evidentiary hearing. 483 F.3d at 982–83. The court explained that the case was "remanded for a single purpose"—"a hearing to

1   resolve *a* critical disputed fact"—and thus "[t]he plain language of the disposition

2   precluded the district court from considering any other arguments concerning [counsel's]

3   effectiveness." *Id.* at 983 (quotations omitted); *see Holmes v. Miller*, 768 F. App'x 781,

4   782–83 (9th Cir. 2019) (explaining that the district court "correctly understood the scope

5   of [its] remand," which did not include taking evidence on an ineffective assistance of

6   counsel claim that had not been raised in the petition).

7        Here, the Ninth Circuit directed "the district court to reconsider, in light of

8   intervening law, Claim 6(b)." (Doc. 125.) Claim 6(b) asserts trial counsel was ineffective

9   for failing to "[r]equest a mitigation specialist or other trained and expert person to do a

10  thorough investigation of Schackart's dysfunctional family origin and mental health

11  status." (Petition at 32.) The Ninth Circuit's remand order further characterizes Claim 6(b)

12  as a claim that "trial counsel was ineffective in failing to investigate mitigating evidence

13  before Schackart represented himself at sentencing with the assistance of advisory

14  counsel." (Doc. 125 at 1.) The scope of this Court's review will be guided by the language

15  of Claim 6(b) and the Ninth Circuit's characterization of the claim. Accordingly, the Court

16  rejects Respondents' contention that Claim 6(b) is limited to the specific allegation that

17  trial counsel failed to request a mitigation specialist.

18  **IV.   PRO SE REPRESENTATION AND APPLICABILITY OF *MARTINEZ***

19       Respondents assert that *Martinez* does not apply to Schackart's IAC claims because

20  Schackart represented himself at sentencing and was co-counsel during PCR proceedings.

21  (Supp. Response at 32) ("[F]or *Martinez* to apply, the default must be attributable either to

22  the failure of counsel, or the trial court's failure to appoint counsel.").

23       Five days after his conviction, Schackart filed a "Motion to Proceed Pro Se." (ROA

24  597–98.) The trial court found Schackart's waiver of counsel was knowing, intelligent and

25  voluntary, and appointed his attorneys as advisory counsel. (*Id.* at 627–28.) The mitigation

26  hearing took place approximately five weeks later. (ROA at 801.)

27       "[A] defendant in a state criminal trial has a constitutional right to proceed without

28  counsel when he voluntarily and intelligently elects to do so." *Faretta v. California*, 422

U.S. 806, 807 (1975). A defendant such as Schackart who "knowingly and intelligently" waives his right to counsel "cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Id.* at 834–35 n.46; *United States v. Flewitt*, 874 F.2d 669, 675 (9th Cir. 1989) ("If [a defendant] chooses to defend himself, he must be content with the quality of that defense."); *see Cook v. Schriro*, 538 F.3d 1000, 1029 (9th Cir. 2008) (explaining that petitioner "cannot raise an ineffective assistance of counsel claim as to his own performance under *Faretta*"). Schackart, however, is not alleging his performance was ineffective, but rather, as the Ninth Circuit acknowledged, he alleges his appointed counsel performed ineffectively during the period "before Schackart represented himself." (*See* Doc. 125 at 1.)

In *Cook v. Ryan*, the Ninth Circuit held that *Martinez* did not apply to Cook's allegations of pretrial IAC during the seven months that pretrial counsel represented him because "Cook could have corrected those errors once he decided to represent himself." 688 F.3d at 609; *see, e.g.*, *Castillo v. Ryan*, 603 F. App'x. 598, 599 (2015) (quoting *Cook*, 688 F.3d at 609) ("Even if his appointed counsel performed deficiently prior to being relieved of his duties, Castillo 'could have corrected those errors once he decided to represent himself.'"). The court explained that "the conduct of the trial and sentencing phases, and Cook's strategy, were his own." *Cook*, 688 F.3d at 609 n.12.

By arguing that Schackart's allegations of IAC are completely foreclosed by *Cook*, Respondents imply that there are no circumstances under which Schackart might assert ineffective assistance of counsel after waiving the right to representation. (*See* Supp. Response at 36 ("Schackart was responsible for any defects in the sentencing investigation once he was allowed to represent himself.").) This argument ignores the appellate court's key factual finding that "Cook could have corrected" former counsel's errors. *Cook*, 688 F.3d at 609. In fact, the Ninth Circuit in *Cook* cautioned that it did "not hold that a *Martinez* claim can never be available to a defendant who represents himself." *Id.* at 609 n.12. Respondents do not allege that Schackart, during the time he had to prepare for sentencing, could have corrected the purported errors by trial counsel that occurred before Schackart

represented himself. The Court therefore rejects the blanket assertion that *Cook* forecloses all relief without first considering whether counsel performed deficiently and whether Schackart could have remedied those deficiencies.

Likewise, Schackart is not precluded from asserting PCR counsel's ineffectiveness as cause to excuse the default of his trial IAC claim under *Martinez*. Respondents cite two cases in support of their argument that *Martinez* cannot apply to Schackart's procedural default of Claim 6(b) because Schackart acted as "co-counsel" during PCR proceedings. (Supp. Response at 32.) Those cases, *Brink v. Wengler*, 1:13-CV-00039-EJL, 2015 WL 874154, *8 (D. Idaho Feb. 27, 2015), and *Bender v. Wynder*, No. Civ.A. 05-998, 2013 WL 3776746, *4 (W.D. Pa. July 15, 2013)), are distinguishable.

In *Brink*, the District Court of Idaho held that *Martinez* did not apply to excuse any of the petitioner's claims because he had represented himself on post-conviction review. *Brink*, 2015 WL 874154 at *8. The court reiterated that *Martinez* is inapplicable where a petitioner "assumes the risk of proceeding without counsel in initial collateral review proceedings." *Id.* (citing *Bender*, 2013 WL 3776746 at *8). Unlike *Brink*, Schackart undertook no such risk. Schackart did not waive his right to be represented by PCR counsel. Schackart represented himself only as co-counsel, supplementing the petition filed by his appointed counsel with an addendum containing issues supplied to counsel by Schackart. (PCR ROA 166–67.)

Similarly, in *Bender*, the court noted that *Martinez* would not apply because the petitioner elected to represent himself, despite the PCR court appointing him counsel. *Bender*, 2013 WL 3776746 at *4. Any default, the court found, was therefore attributable to the petitioner's own ineffectiveness. *Id.* (citing *Faretta*, 422 U.S. at 834–35).

Though Schackart's status as co-counsel permitted him to correct counsel's purported ineffectiveness, he did not waive counsel and therefore he was, under the equitable considerations of *Martinez*, still entitled to effective PCR representation in pursuit of his trial counsel IAC claims. *Accord Martinez*, 566 U.S. at 11 ("[D]efendants pursuing first-tier review [of an IAC claim] are generally ill equipped to represent

1   themselves") (internal quotations omitted) (quoting *Halbert v. Michigan*, 545 U.S. 605,

2   617 (2005)). A review of the facts in *Martinez* supports this conclusion.

3       In *Martinez*, after PCR counsel filed a statement "akin to an *Anders* brief"[9] asserting

4   she could find no colorable claims at all, Martinez was permitted to file a *pro se* petition to

5   preserve his rights but failed to do so. *Id.* at 6. Nonetheless, the case was remanded to

6   determine whether Martinez's PCR counsel was ineffective, *id.* at 18, with the Supreme

7   Court noting that "[t]o present a claim of ineffective assistance at trial . . . a prisoner likely

8   needs an effective attorney." *Id.* at 12.

9       Martinez, like Schackart, had the ability to file and preserve his own IAC claims in

10  state court but failed to do so. Nonetheless, the Supreme Court found counsel's failure to

11  raise the IAC claim permitted consideration on remand as to whether PCR counsel was

12  ineffective and whether Martinez's claim of trial counsel IAC was substantial. *Id.* at 18.

13  Accordingly, the Court finds that the ability of Schackart to raise his own claims did not

14  relieve PCR counsel of the obligation to perform effectively. Thus, the Court will consider

15  whether PCR counsel in Schackart's case was ineffective in failing to raise Claim 6(b).

16      The Court is cognizant that some courts have found *Martinez* inapplicable when a

17  petitioner had the opportunity to supplement counsel's allegedly ineffective brief. *See*

18  *Milton v. Inch*, No. 4:18CV581-RH-MJF, 2020 WL 3213377, at *1 (N.D. Fla. June 12,

19  2020) (concluding that petitioner had an opportunity to file a *pro se* brief after appellate

20  counsel filed an *Anders* brief, and thus petitioner failed to demonstrate that appellate

21  counsel's constitutionally ineffective performance established cause for the procedural

22  _____

23      [9] In *Anders v. California*, 386 U.S. 738 (1967), the Court held that a criminal
    appellant may not be denied representation on appeal based on appointed counsel's bare
24  assertion that he or she is of the opinion that there is no merit to the appeal. The Court
    recognized that counsel may be allowed to withdraw in some circumstances if certain
25  safeguards are followed: Appointed counsel is first required to conduct "a conscientious
    examination" of the case. *Id.,* at 744. Counsel may then request leave to withdraw if they
26  are of the opinion that the case is wholly frivolous. The request "must, however, be
    accompanied by a brief referring to anything in the record that might arguably support the
27  appeal." *Id.* This brief is commonly referred to as an "*Anders* brief." The appellant must
    then be allowed sufficient time "to raise any points that he chooses." *Id.*
28

default of claim), *appeal dismissed sub nom. Milton v. Sec'y, Fla. Dep't of Corr.*, No. 20-12160-B, 2020 WL 5523468 (11th Cir. Aug. 6, 2020); *Martin v. Robinson*, No. CV 19-10142, 2019 WL 7403980, at *5 (E.D. La. Sept. 23, 2019) ("Martin had the opportunity on direct appeal to raise the claim of ineffective assistance of counsel during multiple-offender proceedings [by filing a *pro se* supplemental brief] and simply failed to do so. In this case, the procedural default should not be excused under *Martinez."*), *report and recommendation adopted,* No. CV 19-10142, 2020 WL 32440 (E.D. La. Jan. 2, 2020). The Court finds these cases distinguishable or wrongly decided because they fail to take into consideration whether the petitioner waived counsel under *Faretta* or was able to competently represent himself during PCR proceedings.

Accordingly, the Court finds that Schackart's *pro se* representation does not preclude him from raising a trial-counsel IAC claim or arguing under *Martinez* that the ineffectiveness of PCR counsel excuses the default of the claim.

**V.   DISCUSSION**

To excuse the default of Claim 6(b), Schackart must show that PCR counsel performed ineffectively under *Strickland* by failing to raise the claim ("cause") and that the claim was substantial or had some merit ("prejudice"). *See Martinez*, 566 U.S. at 17.

With respect to prejudice, the Court rejects Schackart's argument that by granting his motion for partial remand, the Ninth Circuit necessarily found Claim 6(b) "substantial." (Supp. Brief at 4.) A *Martinez* remand order does not automatically constitute a finding of substantiality, and in Schackart's case the Ninth Circuit made no such finding with respect to Claim 6(b). *Compare* (Doc. 125) (Ninth Circuit's remand order in this case making no conclusions as to the substantiality of the remanded claim), *with Salazar v. Ryan*, No. 08-99023 (9th Cir. Aug. 19, 2014) ("[C]oncluding that Appellant's remanded claims are for purposes of remand substantial."), and *Hooper v. Ryan*, No. 08-099024 (9th Cir. Aug. 19, 2014) (same).

Nevertheless, upon reviewing Claim 6(b), the Court will assume without deciding that it is substantial and has "some merit," thereby satisfying *Martinez*'s prejudice prong.

1   *Martinez*, 566 U.S. at 14. With respect to the cause prong, the Court will assume that PCR

2   counsel's failure to raise the claim constituted deficient performance under *Strickland*.

3   Accordingly, the Court's analysis will focus on whether PCR counsel's failure to raise the

4   claim was prejudicial; that is, whether there was a reasonable probability of a different

5   outcome during the PCR proceedings if counsel had raised the claim. To make that

6   determination, the court evaluates the strength of the underlying claim of ineffective

7   assistance of trial counsel. *See Hooper*, 985 F.3d at 627; *Atwood*, 870 F.3d at 1059–60;

8   *Runningeagle*, 825 F.3d at 982. The Court begins with an evaluation of trial counsel's

9   performance.

10          A.      Performance

11          Schackart asserts counsel failed to "[r]equest a mitigation specialist or other trained

12   and expert person to do a thorough investigation of Schackart's dysfunctional family origin

13   and mental health status." (Supp. Brief at 11) (citing Petition at 31–32.) He argues that

14   counsel "performed unreasonably when they failed to conduct an adequate and timely

15   mitigation investigation." (*Id.* at 24.) Further he maintains that "[t]rial counsel's

16   ineffectiveness encompassed not simply the failure to immediately undertake a mitigation

17   investigation, but also their failure to obtain expert mitigation investigation assistance in

18   order to competently perform that mitigation investigation." (*Id.* at 25.) He supports his

19   arguments with the declarations of trial counsel and mitigation expert Russell Stetler.

20   (Supp. Brief Exs. 3, 8–9.)

21          Respondents do not dispute that Schackart's counsel failed to seek appointment of

22   a mitigation specialist. (Supp. Response at 4.) Rather, construing the issue narrowly,

23   Respondents assert that Schackart's IAC claim is not substantial because the "assistance of

24   a mitigation specialist is not a requirement for the effective assistance of counsel in a capital

25   case." (Supp. Response at 38.) Respondents also maintain that, even considering a broader

26   "failure to investigate claim," Schackart cannot demonstrate that his attorneys performed

27   deficiently under *Strickland* and its progeny. As discussed above, the Court rejects

28   Respondents' narrow reading of the claim but addresses Respondents' arguments below.

Schackart submits the declaration of Stetler, a former death-penalty investigator and the National Mitigation Coordinator for the federal death penalty projects, in support of the assertion that counsel was ineffective for failing to hire a mitigation specialist. Stetler's declaration, however, does not support a finding that the professional norms at the time of Schackart's trial in 1985 dictated that the defense team include a mitigation specialist. (*See* Supp. Brief, Ex. 3 (Stetler Declaration) at 12–13) (discussing the development of the "mitigation specialist" who, by *1987*, was being recognized as a professional "who should be included in and would be primary to the defense team") (emphasis added).

The Court is aware of no prevailing professional norm that requires counsel in a capital case to hire a mitigation expert in every instance. *See State v. Pandeli*, 242 Ariz. 175, 190, 394 P.3d 2, 17 (2017) ("Defendants do not have a stand-alone right to a mitigation specialist.") (citing *Phillips v. Bradshaw*, 607 F.3d 199, 207–08 (6th Cir. 2010) ("[H]iring a mitigation specialist in a capital case is not a requirement of effective assistance of counsel."), and *State v. Herring*, 142 Ohio St. 3d 165, 28 N.E.3d 1217, 1239 (2014) (holding defendant had no "constitutional right to a mitigation specialist or a right to an effective one")). *Cf. Ramirez v. Ryan*, 937 F.3d 1230 (9th Cir. 2019) ("Due process under *Ake[10]* does not require the appointment of a mitigation specialist."), *cert. granted sub nom. Shinn v. Ramirez*, 141 S. Ct. 2620 (2021). Thus, counsel's failure to hire a mitigation specialist does not render their performance ineffective on those grounds alone.

Because Respondents focused their answer on the narrow issue of counsel's failure to hire a mitigation expert, they do little to dispute Schackart's assertion that counsel had a duty not only to obtain "expert mitigation investigation assistance in order to competently perform [a] mitigation investigation" but to commence such an investigation immediately upon counsel's appointment to the case. (*See* Supp. Response at 24.)

---

[10] *Ake v. Oklahoma*, 470 U.S. 68 (1985). In *Ake* the Supreme Court held "that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* at 83.

"The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. To determine whether counsel provided ineffective assistance in this regard, the question is whether counsel fully investigated the defendant's background. *Wiggins*, 539 U.S. at 524–25. In assessing counsel's investigation, courts "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins*, 539 U.S. at 523 (citation and quotation marks omitted); *see Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quotations omitted) ("[H]indsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made. . . ."). "As long as a reasonable investigation was conducted, we must defer to counsel's strategic choices." *Cox v. Ayers*, 613 F.3d 883, 899 (9th Cir. 2010); *see Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) *as amended* (Aug. 27, 1998) ("While a lawyer is under a duty to make reasonable investigations, a lawyer may make a reasonable decision that particular investigations are unnecessary."); *Williams v. Woodford*, 384 F.3d 567, 616 (9th Cir. 2004).

Trial counsel's duty to conduct a prompt and thorough mitigation investigation was well-established at the time of Schackart's trial. *See Williams (Terry)*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)); *Summerlin v. Schriro*, 427 F.3d 623, 629 (9th Cir. 2005) (en banc) (remarking that professional standards in effect in 1982 "clearly described the ... 'duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction'") (quoting ABA Standards for Criminal Justice 4–4.1 (2d ed. 1980)); *Silva v. Woodford*, 279 F.3d 825, 840 (2002) (stating that while the 1980 ABA Standards for Criminal Justice, which suggest that a lawyer's duty to investigate is "virtually absolute,"

are only guidelines, they were nonetheless cited approvingly by the Supreme Court in *Williams*); *Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001) (finding that the duty to investigate and develop background material "was as crucial in 1980 as it is today") (*see also* Supp. Brief, Stetler Declaration at 1) (citing *Williams (Terry)*, 529 U.S. at 396) ("Counsel's duty to conduct a thorough mitigation investigation was well established in the mid-1980s.). "[C]ounsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.'" *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (quoting *Williams (Terry)*, 529 U.S. at 393). It is imperative that counsel "unearth" all relevant mitigating information at the capital sentencing phase because "[t]here is a 'belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, *may be less culpable than defendants who have no such excuse.*'" *Ramirez*, 937 F.3d at 1243 (quoting *Boyde v. California*, 494 U.S. 370, 382 (1990)).

Schackart points to the absence of any evidence of a mitigation investigation in the record, stating that "[w]hile Schackart's counsel made documented efforts to prepare for the merits phase of the trial, there is no evidence in the record that they did anything to prepare for the penalty phase, including the aggravation-mitigation proceedings and sentencing." (Supp. Brief at 11.) Further, Schackart notes that attorney Klein states in his declaration that he "did not undertake the kind of comprehensive mitigation case preparation that was required to competently present a mitigation case for Mr. Schackart at the sentencing phase." (Supp. Brief, Ex. 8 (Klein Declaration) at 3-4.)

The record indeed suggests that trial counsel did little to prepare for the penalty phase, instead focusing their efforts on the guilt phase of Schackart's trial. (*See* Supp. Brief at 11–15.) Respondents, focusing their argument solely on trial counsel's failure to hire a mitigation specialist, do not contest this point. Trial counsel filed several motions related to the merits phase of the trial from the time of their appointment up until the first day of trial. Multiple hearings were held on defense motions related to merits phase issues. (*See*

1   RT 4/30/84; RT 5/29/84; RT 6/4/84.) Conversely, there is nothing in the record to suggest

2   that counsel was simultaneously conducting a mitigation investigation.

3         Defense counsel did investigate Schackart's mental health and competency as part

4   of their guilt-phase trial strategy. They filed a Rule 11[11] notice of insanity defense and

5   informed the court that they were hiring a mental health expert to perform an evaluation of

6   Schackart's state of mind at the time of the offense. (*See* ROA at 64; RT 6/4/84 at 12, 14–

7   15). However, "[h]iring an expert to evaluate possible guilt-phase mental-state defenses

8   does not discharge defense counsel's duty to prepare for the penalty phase." *Doe v. Ayers*,

9   782 F.3d 425, 441 (9th Cir. 2015). "[W]here counsel is on notice that his client may be

10  mentally impaired, counsel's failure to investigate his client's mental condition as a

11  mitigating factor in a penalty phase hearing, without a supporting strategic reason,

12  constitutes deficient performance." *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir.

13  1995) (citing *Deutscher v. Whitley*, 884 F.2d 1152, 1159 (9th Cir. 1989), *Evans v.

14  Lewis,* 855 F.2d 631, 636–37 (9th Cir.1988)). There is no evidence counsel's decision to

15  forego an investigation into Schackart's mental condition for purposes of a mitigation

16  presentation was a strategic condition. Further, it is difficult to imagine a reasonable

17  strategic choice not to conduct a mitigation investigation here.

18         "Counsel may not rely for the development and presentation of mitigating evidence

19  on the probation officer and a *court appointed* psychologist.... The responsibility to afford

20  effective representation is not delegable to parties who have no obligation to protect or

21  further the interests of the defendant." *Jones v. Ryan*, 1 F.4th 1179, 1191 (9th Cir. 2021)

22  (quoting *Lambright v. Schriro*, 490 F.3d 1103, 1120–21 (9th Cir. 2007)).

23         Moreover, the guilt-phase expert's reports reveal that defense counsel provided the

24  mental health experts with very little background information about Schackart, aside from

25  the information surrounding the murder. On June 26, 1984, Richard Hinton, Ph.D., the

---

26      [11] In Arizona, a criminal defendant files a motion for an examination of a

27  defendant's competence to stand trial and for a determination of the defendant's mental

28  status at the time of the offense under Rule 11 of the Arizona Rules of Criminal Procedure.
    Ariz. R. Crim. P. 11.2, 11.8.

psychologist who performed Schackart's Rule 11 competency examination, issued a report. (*See* ROA at 94.). He noted that he had reviewed the following collateral information for purposes of his evaluation:

> . . . police reports and other materials pertaining to the alleged offense, as well as reports of treatment which [Schackart] has received at the Southern Arizona Mental Health Center [(SAMHC)]. Also available at the time of this evaluation were notes apparently supplied by Dr. Leland K. Reeck [sic]. Also available were several letters which [Schackart] apparently has written to acquaintances in the past.

(*Id.*)

On July 30, 1984, defense counsel's insanity defense expert, psychiatrist Otto Bendheim, M.D., provided a report to defense counsel based on his evaluation of Schackart. (PCR ROA 166, Ex. 19)). The records Dr. Bendheim reviewed included police reports, interviews and statements pertaining to the case, records from SAMHC for treatment from February 1 to March 8, 1984, a letter written by Schackart in jail to a friend, Dr. Hinton's report, and Schackart's high school attendance records. (*Id.* at 4–19.)

Defense counsel had an obligation to conduct a thorough investigation of Schackart's background. *See Williams (Terry)*, 529 U.S. at 396. Aside from evidence in the Rule 11 reports suggesting counsel provided the experts with Schackart's police records, records from SAMHC, and some high school attendance records, there is no indication that counsel investigated Schackart's social history or sought out other potentially relevant information, such as other school, health, or employment records. Nor did counsel attempt to timely uncover relevant mitigating evidence from family members and acquaintances, aside from unsuccessful attempts to contact Schackart's parents while acting as advisory counsel. (*See* Supp. Brief, Exs. 4–7.)

"[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla,* 545 U.S. at 383. "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Richter*, 562 U.S. at 108. However, "when

1  'tantalizing indications in the record' suggest that certain mitigating evidence may be

2  available, those leads must be pursued." *Lambright*, 490 F.3d at 1117 (quoting *Stankewitz*

3  *v. Woodford*, 365 F.3d 706, 719–20 (9th Cir. 2004)).

4        Counsel was on notice that Dr. Hinton had documented that Schackart had sought

5  psychiatric treatment from SAMHC and Dr. Leland Reek just prior to the murder. (ROA

6  at 94.) Dr. Bendheim noted that the SAMHC records revealed that Schackart suffered

7  "from an adjustment disorder with depressed mood" and "a compulsive personality." (PCR

8  ROA Ex. 19 at 15.)

9        Though Dr. Hinton ultimately found Schackart competent to stand trial, he noted

10  that "at the time of the alleged offense questions are raised regarding [Schackart's] ability

11  to distinguish between right and wrong and to appreciate the nature and quality of his

12  actions." (ROA at 95.)

13        Counsel was also on notice that Schackart's mother told a police officer that her son

14  had been under a lot of pressure and was having marital problems. (PCR ROA 166, Ex. 19

15  at 2). Pajkos had also informed a detective that when Schackart left the National Guard and

16  returned home, "he seemed kind of strange, wanted to go deep into religion quite suddenly,

17  kept accusing her of having an affair once in a while, particularly with Don Burnett, his

18  best friend." (*Id.* at 10.) Schackart "told her he couldn't live without her, he wanted to

19  commit suicide." (*Id.* at 11.) Pajkos stated that Schackart "had so many problems" at the

20  time leading up to the crimes. (*Id.*)

21        Dr. Bendheim concluded that Schackart was chronically depressed and suicidal and

22  that "the events of the few months preceding the incident which gave rise to the prosecution

23  are very important." (*Id.* at 23). Dr. Bendheim then described the problems Schackart had

24  in his marriage, also noting that he had started to drink very heavily. (*Id.* at 24.) Dr.

25  Bendheim explained:

26          Under these conditions it is quite obvious that we are dealing with an acute
        emotional disturbance in a person, who was extremely vulnerable toward that

27          sort of thing. His pre-existing feeling of inadequacy and his more recent
        extreme anger, frustration and conviction of having been dealt unjustly

28          culminated in an act of tremendous violence with disastrous results.

1    (*Id.* at 24).

2         Despite several red flags raised in the reports of Drs. Hinton and Bendheim, defense

3    counsel requested no funds for investigation and preparation of the penalty phase and hired

4    no experts who could assist with mitigation issues. Thus, the Court finds that Schackart has

5    presented sufficient evidence, at this stage uncontroverted by Respondents, to overcome

6    the presumption that his counsel conducted an adequate mitigation investigation and that

7    counsel's decision to forego a mitigation investigation into Schackart's family, social,

8    educational, and mental health histories was strategic and reasonable.

9         At a minimum, Dr. Bendheim's report, completed nearly seven months before the

10   guilt phase of trial, should have put counsel on notice that Schackart "has a peculiar

11   psychological make up [sic] and a very strong and psychiatrically important family history"

12   with "certain disabilities and psychological handicaps" (*id.* at 23, 25) and that Schackart

13   carried a diagnosis of "long-standing depression (depressive personality) beginning in

14   childhood." (*Id.* at 23, 25, 26.) Despite these red flags, counsel failed to investigate

15   Schackart's background and mental status as mitigating factors. *See Wiggins*, 539 U.S. at

16   525 (explaining that the scope of counsel's investigation was unreasonable in light of what

17   counsel had actually discovered: the petitioner's mother was an alcoholic, petitioner was

18   shuttled from foster home to foster home and displayed some emotional difficulties, he had

19   frequent lengthy absences from school, and, on at least one occasion, had been left by his

20   mother alone for days without food); *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir.

21   2002) (holding counsel's performance was constitutionally deficient where counsel was

22   aware of defendant's exposure to neurotoxicants but failed to conduct a reasonable

23   investigation into the effects of the exposure on defendant's brain).

24        There were other red flags in Dr. Bendheim's report suggesting the need for counsel

25   to take a closer look at Schackart's social history. Dr. Bendheim had reported that

26   Schackart's mother suffered from serious depression and had attempted suicide, and his

27   younger brother had serious problems with behavior and drugs. (PCR ROA 166, Ex. 19, at

28   19.) Additionally, Schackart was somnambulistic in high school, with "some bedwetting

at th[e] age of 14 or 15." Schackart informed Dr. Bendheim that he believed these incidents were a "bizarre psychological manifestation." (*Id.*)

Counsel's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see Wiggins*, 539 U.S. at 521–22. Given the significant information contained in Schackart's mental health evaluations, counsel's decision not to investigate further was unreasonable.

In countering Schackart's arguments, Respondents point to *Strickland* and two other cases where the Supreme Court held that counsel was not ineffective for failing to conduct certain mitigation investigations. (Supp. Response at 41–42.) In *Strickland*, the Supreme Court found no deficient performance where sentencing counsel failed to request a psychiatric report, obtain a pre-sentence report, investigate the medical examiner's reports, or offer character witnesses. 466 U.S. at 675–76. The Court found that counsel made a strategic choice to forego these investigations and argue for an "extreme emotional distress mitigating circumstance and to rely as fully as possible on respondent's acceptance of responsibility for his crimes." *Id.* at 699.  The Supreme Court noted that the trial judge's views on the importance of the latter factor were "well known to counsel." *Id.* Additional strategic factors counsel considered, such as preventing contrary character and psychological evidence from being admitted, also factored into the Court's determination. *Id.* at 699–700.

In *Burger v. Kemp*, 483 U.S. 776 (1987), the Supreme Court found the failure to present any mitigating evidence, including later-developed evidence of an "exceptionally unhappy and unstable childhood," was not deficient performance. *Id.* at 788–96. Like counsel's approach in *Strickland*, counsel's decision to not present this mitigating evidence in *Burger* was a strategic one. Counsel spoke with the petitioner's mother on several occasions, with an attorney who had befriended the petitioner and his mother, and with a psychologist who had examined the petitioner. Counsel obtained the petitioner's psychological reports and interviewed the co-defendant and other members of the military

at the base where the two defendants were stationed. *Id.* at 791. Only then, "[b]ased on these interviews," did counsel make the "reasonable decision that his client's interest would not be served by presenting this type of evidence." *Id.* Such evidence, the attorney concluded, may have backfired and been counterproductive or unhelpful. *Id.* at 791–93. The Court found that counsel "could well have made a more thorough investigation than he did." *Id.* at 794. The Court held, however, that after interviewing all potential witnesses who had been called to his attention, counsel's decision "not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment." *Id.* at 794.

Finally, Respondents cite *Darden v. Wainwright*, 477 U.S. 168 (1986), explaining that in *Darden*, the petitioner failed to show deficient performance despite the claim that counsel spent only one-half hour between the close of guilt phase and the start of penalty phase in preparing the case in mitigation. (Doc. 141 at 42.) In *Darden*, however, the Court found the petitioner's claim that counsel only spent a half-hour preparing the case for mitigation to be factually incorrect. The Court noted that "[d]efense counsel engaged in extensive preparation prior to trial, in a manner that included preparation for sentencing," including "obtain[ing] a psychiatric report on petitioner, with an eye toward using it in mitigation during sentencing." *Id.* at 184. The Court concluded that the record "clearly indicates that a great deal of time and effort went into the defense of [the] case; a significant portion of that time was devoted to preparation for sentencing." *Id.* at 185.

Unlike the petitioners in these cases, Schackart has presented evidence supporting his claim that counsel failed to conduct an adequate mitigation investigation, and that their decision not to pursue mitigating evidence was neither strategic nor reasonable. Respondents do not refute this. Counsel's failure to uncover and present a case in mitigation cannot be justified as a tactical decision, "because counsel had not 'fulfilled their obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 522 (quoting *Williams*, 529 U.S. at 396) (brackets omitted); *see also Silva v. Woodford*, 279 F.3d 825, 844 (9th Cir. 2002) (discussing *Burger* and *Darden* and

noting that "in each of these cases, trial counsel had already investigated and prepared such evidence beforehand so as to make an informed decision about trial strategy, and had reasonable grounds for electing not to present such evidence at trial.")

Counsel failed to investigate Schackart's background or, lacking the ability or time to do so themselves, failed to seek the assistance of an investigator or mitigation specialist to investigate. Counsel needs to conduct "some sort of mitigation investigation" even if a defendant is fatalistic, uncooperative or instructs counsel not to speak with certain family members. *Porter v. McCollum*, 58 U.S. 30, 40 (2009). "On the contrary, 'if a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial.'" *Hamilton v. Ayers*, 583 F.3d 1100, 1118 (9th Cir. 2009) (quoting *Silva*, 279 F.3d at 847).

Dr. Bendheim's report suggested such an investigation may have been productive and Klein has admitted he knew that mitigation experts were available during the time of Schackart's trial.[12] (Supp. Brief, Ex. 8 at 4.) Counsel had no reason to believe pursuing a mitigation investigation "would be fruitless or . . . harmful." *See Strickland*, 466 U.S. at 691.

Respondents assert that, even taking counsel's declarations as true, "it does not show that it would have done any good for counsel to request appointment of a mitigation specialist" and that Schackart has not demonstrated that a mitigation specialist would have

---

[12] Because the Court finds the scope of Schackart's claim is broader than a mere failure to hire a mitigation specialist and there is no stand-alone right to a mitigation specialist, the Court does not address Respondents' assertion that a mitigation specialist, by that title, would not have been available at the time of Schackart's trial. (*See* Supp. Response at 45–46.) Whether counsel hired a mitigation specialist or an investigator, or performed the work themselves, the duty of counsel to conduct or oversee a competent investigation remains the same, as discussed above. (*See e.g.*, Supp. Response at 45–46) (citing *Scott v. Ryan*, No. CV 97-1554-PHX-PGR, 2011 WL 240746, **20-21 (D. Ariz. 2011) (finding no IAC where counsel testified he believed he followed his practice in capital cases at that time in 1989, to retain an investigator who would gather information for the sentencing phase of trial.)

been available for appointment in 1985. Nonetheless, if counsel requested and failed to obtain a mitigation specialist, because none were available or the court refused to appoint one,[13] it would not relieve counsel of their duty to conduct a proper mitigation investigation through any other means available, *e.g.*, by conducting it themselves or through an investigator or with other expert assistance. Counsel's failure to uncover and present a case in mitigation cannot be justified as a tactical decision, "because counsel had not 'fulfilled their obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 522 (quoting *Williams (Terry)*, 529 U.S. at 396) (brackets omitted). Additionally, during the penalty phase of trial, "counsel has an affirmative duty to provide mental health experts with all information relevant to the formulation of their conclusions." *Stanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010) (citing *Wallace,* 184 F.3d at 1117). Counsel here provided little background information aside from the police reports to their expert, as Dr. Bendheim's report indicates.

The Court has evaluated the performance prong of Schackart's trial counsel IAC claim and, for the reasons stated above, cannot find that the claim lacks merit. The Court focuses next on whether Schackart was prejudiced by counsel's deficient performance.

## B.    Evidence

In assessing prejudice courts reweigh the aggravating evidence against the "totality" of the mitigating evidence. *Wiggins*, 539 U.S. at 534. "In the context of the penalty phase of a capital case, it is enough to show 'a reasonable probability that [the sentencer]' would have recommended a sentence of life instead of death." *Andrews v. Davis*, 944 F.3d 1092, 1108 (2019) (en banc) (quoting *Wiggins*, 539 U.S. at 537). "The likelihood of that result must be 'substantial, not just conceivable.'" *Id.* (quoting *Richter*, 562 U.S. at 112).

The Court begins its evaluation by describing the mitigating evidence before the

---

[13] During PCR proceedings, counsel asked for the appointment of a mitigation specialist and the request was denied. (ROA-PCR at 141, 146.) Respondents also point out that it was not until 2002 that the Arizona Rules of Criminal Procedure were amended to provide for appointment of a "mitigation specialist" in capital cases. *See* Rule 15.9(c), Ariz. R. Crim. P.

1   sentencing court, followed by the new mitigating evidence developed in state PCR and

2   federal habeas proceedings.

3               **1.    Trial court proceedings**

4               *a.  Guilt-phase psychiatric evaluations*

5         Schackart's guilt-phase defense was principally based upon a lack of intent. His

6   defense included the testimony of Dr. Otto Bendheim, a psychiatrist, who shared with the

7   jury Schackart's description of having confused the victim with his wife when she resisted

8   his sexual advances, losing control of himself, and killing the victim. (RT 3/15/85 at 22.)

9   Dr. Bendheim explained that Schackart told him "He was entirely aware of who the girl

10  actually was," but "that there were moments briefly during that which he felt he was with

11  his wife." (*Id.* at 22.) Dr. Bendheim testified that while the story of the confusion between

12  the two women was not very convincing, in his opinion Schackart had acted impulsively

13  and not with intent. (*Id.* at 23-55.)

14        The prosecution called psychiatrist Michael Cleary in rebuttal. (RT 3/16/85 at 9.)

15  Dr. Clearly reviewed records consisting of Dr. Bendheim's report, police reports and

16  interviews, diary excerpts and letters from Schackart to his wife. (Supp. Response, Ex. C,

17  Cleary Report, at 1–2.) Dr. Cleary examined Schackart on February 12, 1985, and

18  Schackart provided him with information regarding Schackart's family background,

19  including his mother's experiences in a Japanese prisoner of war camp in World War II

20  and her psychological treatment for depression as well as his own juvenile history, military

21  service and his physical and mental health. (*Id.* at 2– 4.) Schackart reported to Dr. Cleary

22  "no history of head injury or seizures." (Id. at 4.)

23        Dr. Cleary found "[t]here was no impairment of [Schackart's] thought processes,

24  stream of thought was within normal limits; he talked in a rational, coherent manner, and

25  did not express any delusions or persecutory ideas." (*Id.* at 4.) Further, "[h]e is obviously

26  of bright normal or superior intelligence." (*Id.* at 5.) "The telephone calls made to the

27  police, by the defendant . . . shows clearly that he was orientated, rational, speaking

28  coherently, and able to describe the exact circumstances of the homicide; in a lengthy

interview with Detective Reuter about two hours later, he again discussed in detail the circumstances of the homicide, his motivations and reactions." *Id.*

Dr. Cleary concluded: "I find no mental illness in the defendant, on the basis of this examination, there is no indication that he ever suffered from a psychosis or major mental disorder, but I am unable to state with medical probability what his state of mind was on March 8, 1984." (*Id.*)

### b. Sentencing proceedings

Five days after his conviction, Schackart filed a "Motion to Proceed Pro Se." (ROA 597–98.) Schackart explained that he was "not really against the death penalty" and that counsel would not be representing his best interests in "attempting to make a big scene and prove all the mitigating circumstances" or to contest the aggravating circumstances "except for the most extreme allegations." (RT 3/27/85 at 4.) Schackart explained that counsel's views regarding sentencing were not in line with his "so why should they be representing [him]?"[14] (*Id.* at 6.)

At a subsequent hearing, Schackart explained that he wanted to present the facts regarding his prior conviction, and therefore wanted to call his ex-wife, the doctor who did her medical examination after she reported the sexual assault, and a person who knew his ex-wife. (RT 4/3/85 at 30.) He explained he was not going to argue the fact of the prior conviction, but the witnesses would be relevant at sentencing to show the court the weight the prior conviction should be given. (*Id.* at 29–30.)

On April 8, 1985, the court heard oral argument on Schackart's motion to continue the sentencing. (RT 4/8/85 at 35–36; ROA at 642.) Schackart explained that he intended to move for a diagnostic or psychiatric evaluation for purposes of the mitigation hearing, and

---

[14] In later proceedings, Schackart explained to psychiatrist Dr. Barry Morenz that he "fired his attorneys prior to sentencing because they wanted him to reveal information about his background, especially about his father being a transvestite." (Supp. Response, Ex. F (April 2001 Report) at 3.) As a result of these conflicts, Schackart chose to represent himself. (*Id.* at 4.)

that he had discovered new witnesses who would "be of great use to [him] in the aggravation mitigation hearing." (*Id.*; ROA at 644.) Schackart stated he wanted additional time to interview the witnesses and do further legal research. (*Id.* at 39.) The court granted the motion over the prosecutor's objection, continuing the sentencing for three weeks to May 3. (*Id.* at 43.)

On April 15, Schackart moved the court for a psychiatric evaluation limited to the determination of specific statutory mitigating circumstances. (ROA 663.) Schackart specifically requested that Dr. Bendheim, who had evaluated him and testified during the trial, not conduct the evaluation because he "has an unfortunate tendency to distort his own report, as well as the statements [Schackart] has made to him." (*Id.*) Schackart had stated at an earlier hearing that "there were things I told [Dr. Bendheim] and things that I didn't tell him, which he later complained that I myself told him." (RT 4/8/85 at 45.) Specifically, Schackart explained that "[t]he big deal was with my parents":

> [Pajkos] made a comment which was put down in the transcript about my parents. When [Dr. Bendheim] interviewed me, I specifically told him that it's not true. If it is, it certainly hasn't affected what I did or what my actions were. He later got on the stand and said that he never told me this. This was about my father walking around in women's clothing, so forth. That just floored me.

(*Id.* at 45–46.)

The court granted Schackart's motion for a psychiatric evaluation, limiting the examination to three areas:

> first, whether at the time of offense, the Defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirement of the law was significantly impaired by mental disorder; second, whether the Defendant was under some unusual and substantial duress as a result of some mental disorder; and, third, whether at the time of the offense, there were any psychological factors present, including any aspect of the Defendant's character or propensity toward, or any of the circumstances of the offense itself which would tend to make the Defendant less culpable of the offense.

(RT 4/22/85 at 72.) The court granted Schackart's motion to extend the time to file his

- 30 -

1    sentencing memorandum until April 29, 1985. (ROA 697, 792.)

2        On April 22, 1985, the court heard argument on Schackart's motion to have the state

3    disclose recent cases in which the prosecutor's office "has not sought the death penalty . . .

4    where the killing was accomplished in a much more brutal, depraved manner." (RT 4/22/85

5    at 60.) Schackart sought disclosure of statistical information that would prove the death

6    penalty selection process was discriminatory, specifically, that it violated the Eighth

7    Amendment because he was more likely to get the death penalty "[b]ecause [he] killed a

8    white person." (*Id.* at 66; ROA at 667.) The court declined to order the requested disclosure.

9    (*Id.* at 72.)

10       Schackart filed a sentencing memorandum on April 29. (ROA at 711–735.) He

11   argued that the sentencing court should not impose the death penalty because the State

12   could not prove the existence of an aggravating factor under A.R.S. § 13-703(F)(6)

13   (commission of the offense in an especially heinous, cruel or depraved manner) and little

14   weight should be given to Schackart's prior conviction, an aggravating factor under A.R.S.

15   § 13-703(F)(2) (previous conviction of a serious offense), due to the mitigating

16   circumstances surrounding that incident. (ROA 711–712.)

17       He also alleged the existence of the following statutory mitigating circumstances:

18   A.R.S. 13-703(G)(1) (defendant's capacity to appreciate the wrongfulness of his conduct

19   or to conform his conduct to the requirements of law was significantly impaired); (G)(2)

20   (defendant was under unusual and substantial duress); (G)(4) (defendant could not

21   reasonably have foreseen that his conduct in the course of the commission of the offense

22   for which the defendant was convicted would cause, or would create a grave risk of

23   causing, death to another person); and (G)(5) (defendant's age).

24       Schackart also sought to portray his character as upstanding, arguing that his youth,

25   in combination with the extraordinary circumstances he was under and his resulting

26   emotional condition, were contributing factors to the offense, and that the crimes for which

27   he was convicted show a "marked deviation from his true character." (ROA 733–34.)  He

28   alleged that he lacked a prior criminal record before the conviction for raping his ex-wife,

and that his involvement in "many worthwhile community activities, his appointment to the military academies and his being selected by the Army ROTC, his above-average intelligence, and overall character, show that the instant conviction resulted from extraordinary circumstances and a mental condition which deviated significantly from his norm." (ROA at 712.)

With respect to his mental condition, Schackart cited *State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (Ariz. 1979), to support his argument that the imposition of the death penalty was unwarranted because his mental condition was "sufficiently deviated from his norm." (ROA at 733.) In *Brookover*, the Arizona Supreme Court set aside the death penalty, finding that Brookover's "mental condition"—a neurological lesion that caused a "true suspension of reality"—"was not only a mitigating factor, but a major and contributing cause of his conduct which was 'sufficiently substantial' to outweigh the aggravating factor of [his] prior conviction." *Brookover*, 124 Ariz. at 41–42, 601 P. 2d at 1325–26.

Schackart composed and filed another statement on April 29, which he identified as a "Pre-Sentence Report," consisting of a letter to the sentencing judge, a narrative regarding the murder and events preceding it, and a sentencing recommendation. (ROA at 776–790.) The purpose of the letter, Schackart said, was to explain "a series of complicated events and the way in which [he] reacted to them emotionally," stating that to understand what happened, he needed to go back to August 3, 1982, when he first met his future wife, Alyda Pajkos. (*Id.* at 780.) The letter focused on his ex-wife's infidelities, the threatening "game" he jokingly played with her that she later reported to the police as rape, the psychological harm he experienced in jail after he was arrested for rape, the difficulty he experienced after he was released, his decision to flee to California to avoid incarceration, how on the day he killed the victim "everything was going through [his] head at once," and how he struck the victim after she refused to give him her car or take sleeping pills to let him get away, and later stuck a sock in her mouth after he thought he heard her sigh. (*Id.* at 780–789.) He described leaving the hotel and thinking about "blowing both Alyda and the

scumbags she was living with away" because "I must admit that I never would've reached such a state if Alyda hadn't seen fit to press those bogus charges against me. If she hadn't, none of this would've occurred." (*Id.* at 789.) Deciding against killing anyone else, he stated that he went to his pastor's house and later turned himself in, telling the police a story that was "part truth, part lie and very confused, . . . just to get myself into more trouble." (*Id.* at 789.) As he explained to the detective at the time, he "wanted to die rather than go to prison." (*Id.* at 789.) Schackart stated he would "rather receive the death penalty" but could not "stand for all of the wild and outrageous allegations being made by the State." (*Id.* at 790.)

The sentencing judge had two pre-sentence reports for Schackart, the first one dated July 18, 1984, involving his prior convictions on four counts from the attack on his ex-wife: sexual assault, kidnapping, aggravated assault, and domestic violence. (Supp. Response, Ex. A, at 2.) The first section of the report discussed the facts of the crimes. (*Id.* at 2–3.) This included Schackart's statement, in which he reported he had "been in a severely depressed state" prior to assaulting his wife and had contemplated suicide. (*Id.* at 3.) He opined that he was not guilty of the crimes for which he was convicted, but conceded he was guilty of endangerment because he had pointed a gun at his wife. (*Id.*)

The social history section of this report detailed Schackart's upbringing, education, physical and mental health, marital history, military history, and employment history. (*Id.* at 4–7.) The report also referred to several letters from family and friends, which "note that he is a bright and intelligent person who has a great deal of potential," and describe the crimes as "totally out-of-character for him." (*Id.* at 7.) These individuals suggested that Schackart "would really benefit from a long-term psychiatric program to deal with his emotional problems." (*Id.*)

The second report was dated April 26, 1985, after Schackart's murder conviction. (Supp. Response, Ex. B.) This report "supplement[ed] and update[d]" the previous report. (*Id.* at 2.) It discussed the facts of the more recent crimes and included Schackart's statements about them. (*Id.* at 2–3.) He reiterated what he had told the officers during his

confession, telling the probation officer: "I'd rather received [sic] the death penalty than spend the rest of my life in jail." (*Id.*)

The second report updated Schackart's social history. (*Id.* at 3–4.) The report found no prison violations, except for one disciplinary infraction for having a razor blade in his cell. (*Id.*) With respect to the "numerous" psychological evaluations, the report noted that several "contained statements regarding his family's background that he [Schackart] felt were damaging and upsetting." (*Id.* at 4.) Schackart was uncertain if he had a mental disorder but reported "no suicidal tendencies and is not taking any medication at the present time." (*Id.*) The report concluded that "the defendant suffers from character disorders rather than any psychosis." (*Id.*)

In the report, Schackart commented: "Incarceration is really not the answer; I'm not a violent person, and this was totally out of character for me." (*Id.*) He was "still angry about his marriage," "felt the collapse of his marriage led to his involvement in the instance offense," and "that he was unjustly convicted in the previous matter, which left him with a great deal of bitterness." (*Id.*)

The officer who compiled the report made several attempts to contact Schackart's parents but was unsuccessful. (*Id.*) The report reconsidered its prior conclusion that Schackart came from a "basically supportive home environment" and instead found "there was dysfunction within the home." (*Id.* at 5.) The report found Schackart "emotionally ill equipped to deal with his marriage, and its collapse proved to be fertile ground for his involvement in the instant offense." (*Id.*) The report noted Schackart's lack of a prior record before the collapse of his marriage, his positive work record, his supportive friends, and "his history of family instability." (*Id.*)

Advisory counsel Noble sent the probation officer Dr. Cleary's report as well Dr. Bendheim's 26-page report dated July 30, 1984. (Supp. Response, Ex. C.)

*c.  Aggravation and mitigation hearing*

The aggravation and mitigation hearing was held on May 3, 1985. The prosecutor called one witness: Gloria Bogulas, the mother of the victim's fiancé. (RT 5/3/85 at 7.) Ms.

- 34 -

Bogulas testified as to the "kind" and "intelligent" character of the victim, the likelihood Schackart would "become a well publicized type of jailhouse lawyer," and asked the court to impose the "absolute maximum sentence with no chance for parole." (*Id.* at 9.) Schackart cross-examined Ms. Bogulas, questioning her judgment of his character in the absence of any personal contact with him and asking whether she was judging him based on her view of the victim's appearance after the autopsy. (*Id.* at 11–15.) The court later struck Bogulas's testimony at Schackart's request. (ROA at 798.)

Schackart called nine witnesses at his mitigation hearing. Throughout his mitigation presentation, consistent with his stated intent (RT 5/3/85 at 29–30), Schackart attempted to cast doubt on his conviction for raping his ex-wife. (*Id., passim.*)

Schackart questioned Earl Mincer, a former acquaintance of both Schackart and his ex-wife, regarding an incident in which Pajkos called Mincer and told him that a man named Joe Burton had raped her. (*Id.* at 16–19.) Mincer stated that Pajkos was crying and hysterical when they started talking. She calmed down, however, and refused to take any kind of action, so by the time Mincer hung up he no longer believed she had actually been raped. (*Id.* at 20.) Mincer stated Pajkos had a tendency to "speak first without thinking about it" and was "dramatic." (*Id.* at 21.) She was also "unintentionally promiscuous and often found herself in unexpected situations." (*Id.*) Mincer also testified that on the occasions he witnessed Schackart when he was angry, he "always seemed to direct it inward," he did not yell or scream at people, he "just kind of sunk into the background." (*Id.* at 23.) Mincer testified that Schackart confided in him that Schackart occasionally slapped Pajkos during their marriage. (*Id.* at 25.) Mincer believed that "to some extent" Schackart was provoked into hitting her. (*Id.*) Mincer testified that Schackart was not the sort of person who would kill someone intentionally or with premeditation, and that he would "definitely" have the capacity for being sorry for what he had done. (*Id.* at 30.) He testified that "general emotional problems . . . [p]ossibly incidents before" could have provoked Schackart to the degree he was capable of killing someone. (*Id.* at 30.)

Schackart called Joe Burton to question him about his relationship with Pajkos. (*Id.*

at 36–37.) Burton admitted the relationship but denied raping her. (*Id.* at 37.) He testified that if she had reported that he forced her she was "probably confused." (*Id.* at 37.)

Schackart called David Kubista, a student at the University of Arizona and a captain in the Air Army National Guard who commanded the battery of the 180th Battalion to which Schackart was assigned as an ROTC cadet. (*Id.* at 120–21.) Kubista testified that Schackart worked in the fire direction center, generating the data that artillery uses to fire shells. (*Id.* at 123.) Kubista explained the position was demanding, requiring an understanding of geometry and mathematical components, and the ability to work with radios. (*Id.*) Kubista recalled Schackart as a "neutral individual," a term he used to describe individuals who perform well but don't stand out in his memory as extreme "given the number of people he has to work with." (*Id.* at 127–28.) He did recall a time, after Schackart was married in spring of 1983, when Schackart was required to attend advanced individual training at Fort Sill, Oklahoma, after he was reverted down to his enlisted rank (*id.* at 126), and another occasion when Schackart left a two-week training session early because he felt his wife was cheating on him (*id.* at 127, 130).

Janet Watson, a teacher at Palo Verde High School, testified she met Schackart when he was a sophomore in 1977. (*Id.* at 135.) Watson testified that Schackart was involved academically, particularly with the journalism program, and interacted "pretty well most of the time" with the other students on the staff, most of whom were intellectually superior students. (*Id.* at 136–37.) Watson couldn't say Schackart was "well liked" by others, stating that "[r]espected would be a better word." (*Id.* at 137.) Watson noted some amount of animosity towards him, but she wasn't sure "if it was serious." (*Id.* at 137.) Watson explained that Schackart's nickname was "the rectifier" because "[i]f somebody left out a comma, a quotation mark, put one where it wasn't needed, those types of things, simple printing errors, [he] would come in and list them in some way so that all the others would see all their mistakes." (*Id.* at 138.) Watson could not recall specific instances of Schackart getting angry, having problems with women or girls, showing any disrespect, or making inappropriate remarks. (*Id.* at 139.)

1      Watson recalled Schackart later participating in a school for gifted students and

2 taking part in extracurricular activities including an internship program at the *Tucson*

3 *Citizen* newspaper, contributing to a newspaper called *Youthful Alternatives*, participating

4 in a Model Lecture group, and doing regular interviews for a high school radio program.

5 (*Id.* at 139–41.) Watson also recalled Schackart's interest in attending the military

6 academies and was aware that the Naval Academy and the Army and Marine Academy

7 had accepted a nomination from him when he graduated. (*Id.* at 141.)

8      Watson believed Schackart would not have just gone out and wantonly killed

9 someone, and that he was acting out of character when he killed Charla. (*Id.* at 142–43.)

10      Leon Hauck testified on Schackart's behalf as a friend who had known Schackart

11 "on and off for the last five years." (*Id.* at 145.) He had also known Pajkos for

12 approximately the same amount of time. (*Id.* at 146.) Hauck confirmed that Schackart told

13 him that he felt Pajkos was having an affair but couldn't remember whether Schackart had

14 told him he had caught Pajkos in bed with another man. (*Id.* at 148.)

15      Schackart called Denise Fox, a friend and former co-worker at Circle K , to testify

16 on his behalf. (*Id.* at 152–53.) Schackart attempted to question Fox about times he had

17 spoken with her about his marital difficulties and told her that he had been put in jail

18 because his wife charged him with rape, but Fox could not recall these conversations. (*Id.*

19 at 154–55.) Fox did testify that Schackart would visit her, and she would take a shower

20 while he was in the apartment but would not lock the door, at least "[n]ot all the time,"

21 because she did not feel unsafe with him in the apartment. (*Id.* at 156.) She testified she

22 wasn't scared of him; he never made sexual advances or improper remarks and she did not

23 feel that he hated women. (*Id.* at 157.) She testified he was a good person, honest and

24 trustworthy, and she did not think that he would have killed his friend on purpose. (*Id.* at

25 157.)

26      Schackart called his ex-wife, Alyda Pajkos. (*Id.* at 160.) Schackart explained to the

27 court, over numerous objections by the State, that his line of questioning regarding Pajkos

28 went to the:

1
2
3
4
5

. . . state of mind that I was in over a marriage, after having married, after having thrown away my military career, my educational career for the marriage, and, in essence, everything to work for was her, and then to find out that this woman is going out and having an affair, and having seen it with my own eyes, and having her falsely accuse me of rape and coming on the stand and acting like a, you know, just a normal, chaste woman, with normal, moral values, it's ridiculous.

6
7
8
9

That goes to show my state of mind, everything was gone that I had to live about, and I still have to. At the time I still had to feel that, you know, she's out there living with this guy and I still loved her, and that was just eating away at me. I feel, you know, the facts of the matter should come out, not just the accusations that she was making.

10

(*Id.* at 173–74.)

11
12
13
14
15
16
17

Pajkos denied that anyone other than Schackart had forced her to have sex "through the whole thing," but testified that she recalled saying something to either Schackart or someone else that Joe Burton had "at first forced himself" upon her, and then later she "agreed to it." (*Id.* at 162.) When asked if she had told anyone, including Schackart, her sisters, or Earl Mincer that Joe Burton had raped her, Pajkos replied: "I may have said that in the context that – I can't recall, it's so long ago." (*Id.* at 167.) Pajkos denied ever having an affair. (*Id.*)

18
19
20
21

Pajkos testified that "a few times" Schackart would go out of his way to avoid situations in which he might strike her; he would leave or go driving or into another room in the house to cool off. (*Id.* at 192.) On a few occasions, however, she would follow him and continue the argument until he slapped her or pushed her away. (*Id.* at 192.)

22
23
24
25
26
27

Dr. Glen Ray Kartchner, an emergency room doctor, testified about the sexual assault examination he performed on Pajkos. (*Id.* at 42–43; *see* ROA at 758.) Dr. Kartchner's report, dated January 27, 1984, described Pajkos's emotional state at the time as "calm," which meant "she was not crying, was able to answer questions normally on a person-to-person basis without any particular emotional overlay." (*Id.* at 45; ROA 758–59.) Her appearance was normal, with no report or evidence of trauma. (*Id.* at 46–47.)

28

Dr. Bendheim testified that he examined Schackart looking for factors "which

would mitigate against the death penalty." (*Id.* at 51–52.) He reviewed Schackart's records and psychological reports from SAMHC; a report by a psychiatrist whom he identified as Dr. Reedy; a report prepared by a jail psychologist; the report of Dr. Hinton, a clinical psychologist for the Pima County Court Clinic; a letter written by Schackart to a friend following Schackart's arrest; police reports; Schackart's confession; the pastor's report; several statements and taped interviews of Schackart's family members, friends, acquaintances, and witnesses; Schackart's high school attendance records; and Dr. Hinton's psychological report. (*Id.* at 104–06.)

Dr. Bendheim testified he believed Schackart was bright, with normal to high intelligence, and was able to appreciate and foresee what he had done. (*Id.* at 62.) Dr. Bendheim opined that although Schackart was highly intelligent, he had been severely handicapped emotionally for many years. (*Id.* at 93.)

Dr. Bendheim testified that Schackart was "suffering from considerable distress due to longstanding personal problems within the family, within [his] own life, dating from childhood, occasionally requiring psychiatric intervention and help." (*Id.* at 52–53.) He explained that at the time Schackart murdered the victim he was under stress "due to a disappointing marriage which had broken up," a trial in which Schackart was charged and convicted for raping his wife, which Schackart felt "was a miscarriage of justice due to perjury and lies by witnesses." (*Id.* at 53.) Dr. Bendheim explained when Schackart sought to renew his acquaintance with the victim, he was in a frame of mind of "bitterness and utter despair" over having lost his wife, his court battle, and his "honor." (*Id.*)

Dr. Bendheim testified Schackart was not impaired at the time "in regards to the intent to have . . . an intimate relationship" with Charla, or in "trying to silence her and to make it not possible for her to immediately notify the authorities," but there was "considerable impairment" as to any intent to "inflict[] permanent damage to [the victim]," that could possibly result "in serious injury or death." (*Id.* at 54.) Dr. Bendheim believed that Schackart never intended to kill the victim, that his conduct deviated significantly from his normal conduct, and that the confusion Schackart had regarding the victim and his wife

1   would constitute a significant amount of impairment. (*Id.*)

2       Dr. Bendheim reiterated that Schackart was under considerable distress for many

3   reasons, going back "for many years" to "very serious family problems." (*Id.* at 56.) Dr.

4   Bendheim explained:

5       Together with the underlying personality structure, we have a child here, who
        from very early childhood has been aware of distress, utter distress when the
6       family threatened divorce.

7       On many occasions his mother was given to have significant depression and
        needed psychiatric care for many years, a father who turns out to be a sex
8       deviate sexually [sic], causing distress for the whole family; his brother, his
        only sibling, having serious problems with conduct behavior and being
9       addicted to drugs, and trouble with the law.
10

11      Then we have this young man who, from his school days, grade school days
        on, felt a great deal of inadequacy, that girls did not appreciate him.

12      He falls in love, up and married her on the spur of the moment and he remains
13      in love with the young lady, but is extremely disappointed in her conduct
        when he found her to be a thief. He found her to be unfaithful, a liar, and
14      finally she divorced him even though he made every attempt to remain in that
        relationship.
15

16      He then finds himself accused of raping that woman, a charge which to this
        day he cannot accept as true. He now is a felon, dishonored, facing a
17      considerable penalty.

18      He meets another woman whom he has known, but not known intimately,
        with whom he hopes to establish a relationship.
19

20   (*Id.* at 56–57.)

21       Schackart elicited testimony from Dr. Bendheim regarding his report that Schackart

22   had persecutory ideas having to do with the rape trial, that he had depressive neurosis

23   throughout his life, with moments of "severe unhappiness and disappointments and

24   feelings of inadequacy, inferiority," and that at the time of the offense these conditions

25   "would present a fertile soil from which lack of impulse control, anger, frustration, even

26   violence could grow." (*Id.* at 58.)

27       On cross-examination, Dr. Bendheim explained that Schackart was taken to a

28   psychiatrist in his early teens and to a doctor for sleepwalking. (*Id.* at 71.) At age 13 or 14

- 40 -

1   he began to bed wet again. Dr. Bendheim explained these were signs of immaturity and

2   severe psychological stress, though the nature of the stress wasn't known. (*Id.*)

3      Schackart elicited further testimony from Dr. Bendheim regarding the relationship

4   of Schackart's age to his impulse control. Though Schackart was an impulsive person, Dr.

5   Bendheim stated "impulse control in anybody improves with maturity and gaining in

6   years." (*Id.* at 61.) He further testified that with "help and guidance" the chances of "this

7   sort of thing not occurring again would be better. . . ." (*Id.* at 62.) Dr. Bendheim hoped that

8   rehabilitation and treatment would help Schackart resolve his problems. (*Id.*) On cross-

9   examination, Dr. Bendheim admitted Schackart had been seeing a professional counselor

10  and had a session with him on the morning before the murder. (*Id.* at 64 –65.) Dr. Bendheim

11  also testified that Schackart's confusion about who he killed "went back and forth several

12  times during that short period" and was a "very unusual disorientation." (*Id.* at 72.)

13     The sentencing judge also elicited testimony from Dr. Bendheim, including

14  testimony that Schackart had stated he wished to have the death penalty imposed rather

15  than spend the rest of his life in prison. (*Id.* at 108.) Dr. Bendheim explained that while

16  Schackart did not make this statement because he was feeling remorseful, he was not

17  without remorse. (*Id.* at 108–09.)

18     Schackart requested a continuance of the hearing for purposes of obtaining the

19  testimony of Captain John Barbier, who could testify about how Schackart was suffering

20  academically and emotionally in 1981 and 1982 due to problems that were occurring within

21  his family, "specifically [his] parents [sic] reaction to [his] brother having trouble with

22  drugs, and that [he] suffered academically; and in fact, . . . requested a six month leave

23  from the ROTC program." (*Id.* at 195–96.) Schackart also stated Barbier would attest to

24  his conduct around women and his involvement in extracurricular activities and would

25  "just be a good character witness." (*Id.* at 196.) Barbier could further testify that Schackart

26  did not hate women or make inappropriate remarks around them, that he could deal with

27  his anger effectively, and that he was a person of high character, potential, and honesty.

28  (*Id.* at 196.) The court stipulated that this is what Barbier would testify to in an offer of

1  proof. (*Id.* at 197.)

2       Schackart's counsel stated at the hearing that they had been unsuccessful in attempts

3  to subpoena Schackart's parents to testify. (*Id.* at 198.) Schackart's father had "apparently

4  left the state, apparently on business, although we have reason to believe there are other

5  reasons. He made threats that if subpoenaed he would do everything he could to hurt Mr.

6  Schackart." (*Id.*) Counsel believed, based on their investigator's affidavit, that Schackart's

7  mother was attempting to evade service of the subpoena. (*Id.*) Pima County Public

8  Defender Criminal Investigator Gene Reedy submitted an affidavit stating that he

9  attempted to serve subpoenas on Schackart's mother and father over the course of three

10  days, noting that a car was in the driveway, the trash had been emptied, and a neighbor

11  believed them to be home, but that they would not answer the phone or the door. (ROA at

12  799–800.)

13       Counsel informed the court that he had advised Schackart to request a continuance

14  to allow them to call his parents as witnesses, believing them to be material, especially in

15  light of the prosecutor's "consistent insinuations that what Mr. Schackart told to Dr.

16  Bendheim was not truthful, and particularly, was not truthful as far as his family history."

17  Schackart advised, however, that he did not want the hearing continued for that purpose,

18  and "does not in fact want to call them to testify." (RT 5/3/85 at 198.) While the court

19  suggested their testimony might not be helpful if they were unwilling to appear, counsel

20  countered that "despite this unusual behavior" he believed Schackart's parents "would

21  testify truthfully, despite what they say outside of the court" and that "part of the reason

22  why Mrs. Schackart is unwilling to be served and come in is a function of her psychiatric

23  problems." (*Id.* at 199.) Counsel thought "their testimony would be very significant," both

24  "in terms of their statement in the pre-sentence report. . . and also in terms of the mitigating

25  circumstances concerning defendant's family background." (*Id.* at 199–200.)

26       The court found that Schackart, who had advised counsel that he did "not want to

27  have [sentencing] continued for that purpose, and does not in fact want to call them to

28  testify" (*id.* at 198), had a right "not to ask for a continuance, and that it is a reasonable

decision under the circumstances." (*Id.* at 200.)

Following the aggravation/mitigation hearing, the trial court rendered its sentence. The court found the mitigating circumstances not sufficiently substantial to call for leniency, and sentenced Schackart to death for the murder and to a term of years for the other counts. (ROA at 837–38.)

### d.  Appeal

On direct appeal, the Arizona Supreme Court noted that there were serious problems with the transcripts.  *Schackart I*, 858 P.2d. at 642–44. It concluded that the transcripts for the trial and the aggravation/mitigation hearing were sufficient for proper appellate review. *Id.* at 644. The court rejected Schackart's attacks on his convictions. *Id.* at 644–648. The court also affirmed his sentences for the kidnapping and sexual assault convictions. *Id.* at 648. However, the court found the sentencing transcript inadequate with respect to the murder conviction and remanded for a new sentencing hearing. *Id.* at 644. The court added that "[t]he trial court need not repeat the aggravation/mitigation hearing . . . because that proceeding was transcribed in full." *Id.* at 644.

### e.  Resentencing

On remand, Schackart was represented by attorney Sarah Michele Martin, of the Pima County Legal Defender's Office, assisted by attorney Robb Holmes. (*See* Resentencing-ROA at 39–40.) Martin submitted a 31-page Memorandum of Law for Sentencing. (*Id.* at 49–79.) Counsel also attached Schackart's DOC records. (*Id.* at 80–98.)

The probation officer filed a two-page addendum to the presentence report, which noted the prior presentence reports. (Supp. Response, Ex. D.) It related that Schackart had been incarcerated with DOC as of May 14, 1985, and had "worked as a porter, a janitor, and a law library clerk." (*Id.* at 1.) It also noted he had been "the subject of disciplinary actions in 1986, 1987, and 1988 for Disobeying an Order, Attempted Escape, and Destroying Property respectively." (*Id.*)

Counsel requested a full mitigation hearing before resentencing. (Supp-ROA at 42; RT 10/22/93 at 2–5.) Judge Brown denied the request for a new hearing but permitted

counsel to present additional mitigation evidence as an offer of proof to complete the record. (Supp-ROA at 71; RT 10/22/93 at 7–8.) Counsel renewed the motion at the resentencing hearing and requested a continuance to prepare. (RT 12/7/93 at 2.) The court denied the continuance and proceeded with sentencing. (Resentencing ROA at 103; RT 12/7/93 at 10.)

The court allowed Schackart to allocute and he did so. (12/7/93 at 12–17.) Schackart expressed frustration that the court misconstrued his attempts to express remorse. (*Id.* at 12–13.) He disputed his prior conviction for raping his ex-wife. (*Id.* at 14–15.) He also disputed some things the judge had said at the prior sentencing. (*Id.* at 15–17.) He stated he turned himself in for the murder and made up a story about raping the victim because he "wanted to get the death penalty" for what he had done, and because he "simply couldn't live with what [he] had done." (*Id.* at 16.) Schackart asked for a life sentence. (*Id.* at 17.)

The court proceeded with sentencing, stating it had reviewed letters submitted on Schackart's behalf by friends, family members and others, but did not review the letters sent by people "who wanted to say bad things about" Schackart. (*Id.* at 27.)[15] The court also "again reviewed the facts adduced at the trial, all the evidence of mitigating factors even remotely reliable or relevant." (*Id.*) The court reiterated that it had reviewed, "all of the matters proffered to the Court in mitigation. I have weighed those factors, the evidence supporting them and their significance." (*Id.* at 29.)[16]

---

[15] These letters were not contained in the record received from the Arizona Supreme Court, nor were they included in the inventory of the transmittal of record from the Arizona Supreme Court. The Court notes that their absence, however, is not prejudicial to the Court's ruling on Schackart's supplemental *Martinez* brief because they weigh on the side of demonstrating a lesser, not greater, prejudicial impact of counsel's failure to conduct a mitigation investigation. Schackart does not argue otherwise, nor reference these letters in support of any of his assertions.

[16] On direct appeal, Schackart alleged the trial court failed to consider his nonstatutory mitigation. *See Schackart II*, 190 Ariz. at 252, 947 P.2d at 329. The Arizona Supreme Court found that although the trial court did not specifically discuss each piece of evidence as statutory and then nonstatutory mitigation, he "clearly considered it all, even that which did not qualify under any subsection of 13-703(G)." *Id.*

The court again found two aggravating circumstances: Schackart's prior violent felonies and the murder being committed in an especially cruel, heinous or depraved manner. (*Id.* at 21–22, 24–27.) The court rejected Schackart's claim of remorse, and found he committed the crimes "with a depraved mind and a malignant heart." (*Id.* at 26–27.) The court considered the proffered evidence and found several mitigating circumstances: (1) Schackart's age; (2) his "lack of real contact with the criminal justice system until January 17th of 1984[17] and [his] laudable youthful activities;" (3) he is "more impulsive than the average person and [his] capacity to conform [his] conduct to the requirements of the law was to some extent impaired," and (4) he was "at the time in question under substantial stress." (*Id.* at 27–28.)

After weighing the aggravating and mitigating circumstances, the court found "beyond a reasonable doubt that the mitigating factors and circumstances shown are not sufficiently substantial to call for leniency." (*Id.* at 29.) Accordingly, it re-sentenced Schackart to death on the first-degree murder conviction. (*Id.* at 30.) It further found that either aggravating circumstance alone would be sufficient to warrant imposition of the death penalty. (*Id.* at 31.)

After resentencing, Schackart's counsel declared that they had spoken with and obtained an affidavit from Schackart's mother, "which specifically sets forth many of the family's problems," and, in light of this information, attempted to locate a mental health expert to evaluate Schackart but did not have time to make those arrangements. (Resentencing ROA at 137–38.)

Counsel also submitted an offer of proof containing testimony from two correctional officers regarding Schackart's good behavior while incarcerated and a letter from Dr. Eduardo Caraveo, a psychologist, who had reviewed the affidavit from Schackart's mother and opined that it "might have provided critical data in terms of conducting the two prior psychiatric evaluations" and might provide "critical variables in terms of mitigating his

---

[17] Schackart was charged with sexually assaulting his wife on this date and was convicted on June 8, 1984. (*See* ROA at 821–832.)

1    sentence." (Resentencing ROA at 138.)

2        The Arizona Supreme Court struck the trial court's (F)(2) prior violent conviction

3    and (F)(6) heinous or depraved findings but upheld the (F)(6) cruelty finding and after

4    reweighing affirmed the death sentence on direct appeal. *Schackart II*, 190 Ariz. at 261,

5    947 P.2d at 338.

6                              *f.   PCR proceedings*

7        Attorney Mathew Newman was appointed to represent Schackart in the PCR

8    proceedings. (PCR ROA 2.) Newman did not file a claim alleging trial counsel was

9    ineffective for failing to investigate mitigating evidence or hire an expert to do so. He did

10   attempt to develop evidence of Schackart's mental illness to support a claim that, in the

11   first direct appeal, appellate counsel performed ineffectively by failing to raise an *Ake*

12   claim based on the sentencing court's failure to appoint an independent mental health

13   mitigation expert. (*See* PCR ROA 166 at 34–38.)

14       Newman filed motions for appointment and compensation of an investigator, which

15   the court denied. (PCR ROA 9, 10, 15, 19.) He also filed a motion for neuropsychological

16   testing to support the *Ake* claim, arguing that Dr. Bendheim had not tested for "organic

17   brain damage." (PCR ROA 22 at 1, 24.) The court denied the motion, finding "there is not

18   a shred or scintilla of evidence in this case to this date that there was anything organically

19   wrong with the defendant mentally or otherwise at the time he committed the crime." (PCR

20   ROA 26 at 2.) It also found irrelevant whether "a mental illness is functionally based as

21   opposed to organically based. . . ." (*Id.* at 2–3.)

22       In his motion asking the court to appoint him as co-counsel, Schackart informed the

23   PCR court that he had been diagnosed by prison psychiatrists with paranoid schizophrenia

24   and had been taking "various psychotropic medications prescribed by ADC psychiatrists

25   (since late 1986/early 1987) in the hope that it would keep his schizophrenia under

26   control[.]" (PCR ROA 32 at 3.) Schackart then moved for and was granted access to his

27   prison mental health records. (PCR ROA 38, 43.) After reviewing his mental health

28   records, Schackart noted they indicated he was a paranoid schizophrenic and exhibited

1    psychotic symptoms which were being controlled with antipsychotic medications. (PCR

2    ROA 38, Ex. B.)

3         PCR counsel moved again for a mental health evaluation for purposes of raising a

4    claim of ineffective assistance of re-sentencing counsel based on counsel's failure to

5    present "highly relevant material" that was "readily available." (PCR ROA 78 at 6.) In

6    support of the motion, Schackart submitted a report, dated October 12, 2000, from

7    psychiatrist Dr. Barry Morenz. Dr. Morenz prepared the report after reviewing Schackart's

8    mental health records from the Department of Corrections dating from February 18, 1986.

9    (Supp. Response, Ex. E (October 2000 Report).) In his report, Dr. Morenz concluded that

10   "there is a substantial probability that Mr. Schackart suffers from a serious mental illness,

11   specifically paranoid schizophrenia." (*Id.* at 3.)

12        The court granted the motion, appointing Dr. Morenz to conduct the examination.

13   (PCR ROA 90). Schackart also moved for the appointment of a mitigation specialist to

14   perform an investigation to support Dr. Morenz's preliminary evaluation, dated April 27,

15   2001. (Supp. Response, Ex. F (April 2001 Report)). (PCR ROA 141.) The court denied the

16   motion, noting that Dr. Morenz could conduct interviews telephonically with anyone who

17   might have input into his evaluation. (PCR ROA 146.)

18        The PCR court later ordered a "follow-up examination" by Dr. Morenz. (*Id.* at 165.)

19   Dr. Morenz prepared a third and final report on December 17, 2001, after interviewing

20   Schackart's parents. (Supp. Response, Ex. G (December 2001 Report).) Schackart filed a

21   PCR petition and a subsequent addendum. (ROA 166, 167.) In support of his *Ake* claim,

22   Schackart submitted the April 2001 Report, in which Dr. Morenz indicated "Schackart

23   appeared to have been developing a schizophrenic disorder around the time he married his

24   wife in 1983." (April 2001 Report at 8.)[18] He further opined that "[b]y the time [Schackart]

25   _____

26        [18] Though Respondents assert that the December 2001 Report was filed in state
     court, the Court finds no reference to the report in the state court record. The Court will,
27   however, consider the December 2001 Report, developed in "subsequent proceedings" as
     part of its analysis when it "reweigh[s] the evidence in aggravation against the totality of
28   available mitigating evidence." *See Wiggins*, 539 U.S. at 534.

committed the sexual assault in January 1984, he may have become severely depressed and psychotic," . . . and "[w]hen he was in prison, he became floridly psychotic." (*Id.*) Dr. Morenz concluded that to complete a more thorough evaluation, additional data was needed, including family interviews, and that psychological, neurological examinations might also be necessary to complete such an assessment. (*Id.*)

The PCR court declined to consider this evidence, finding Schackart's *Ake* claim to be procedurally defaulted because it was not raised in his first direct appeal. (PCR ROA at 20.) Nonetheless, after finding the claim precluded, the court concluded that "nothing in [Dr. Morenz's] reports adds significantly to the evidence presented at sentencing." (*Id.*) As noted above, PCR counsel did not raise a claim based on trial counsel's failure to investigate mitigating evidence. (*See* PCR ROA 166.)

## 2.      Federal habeas proceedings

Schackart asserts that recent mental health evaluations confirm Dr. Morenz's diagnoses of schizophrenia and psychosis, diagnoses that could have been developed at the time of Schackart's trial and demonstrate that Schackart has frontal and temporal lobe brain damage. (Supp. Brief at 28–29.) Schackart also argues that a persuasive personal and family history could have been developed, which would have supported the mental-health mitigating evidence and constituted independent mitigation. (*Id.* at 36.)

### a.      Social history and background

Schackart's father has now submitted a declaration explaining that Schackart's birth was assisted with forceps, and it "was frightening"; he looked "like he had two heads, which did not go away for about two months." (Supp. Brief, Ex. 4 at 2.) Schackart also reported that he experienced a motorcycle accident with a loss of consciousness while attending college. (Supp. Brief, Ex. 1 at 9.) While Schackart did well in his first year of college, attaining mostly A's and B's, his grades began deteriorating in 1981 and eventually he had to withdraw. (*Id.*)

Lawrence Campbell, Schackart's former teacher; Arlan Witbeck, a neighbor and fellow student; and Robert Cannon, a high school classmate, submitted declarations stating

1   that no one from Schackart's prior defense teams had ever spoken with them. (Supp. Brief,

2   Exs. 5–7.) If they had, Campbell states he would have provided information about

3   Schackart's "outstanding" academic career and "excellent" social behavior. (Supp. Brief,

4   Ex. 5.) Witbeck would have provided information about the "totally different life"

5   Schackart lived, prohibited from playing and socializing much, and viewed by others as

6   lacking in athleticism and social skills. (Supp. Brief, Ex. 6.) Cannon described Schackart

7   as "odd but brilliant," "somewhat unstable," and "paranoid." (Supp. Brief, Ex. 7.)

8                *b.*    *Psychiatric and Neuropsychological evaluations*

9        Dr. Ruben Gur, a neuropsychologist, evaluated Schackart on April 19 and May 21,

10  2012. (Supp. Brief, Ex. 1 at 1.) Dr. Gur reviewed records, interviewed Schackart, and

11  administered numerous tests. (*Id.* at 1–6.) Dr. Gur concludes in his report that Schackart's

12  pattern of neuropsychological performance indicates "dysfunction of posterior parieto-

13  occipital and temporal areas, extending inferiorly and anteriorly and affecting the frontal

14  lobe." (*Id.* at 9.) In Dr. Gur's opinion, these deficits are likely developmental in nature and

15  impacted by the effects of a forceps delivery interacting with the results of a motorcycle

16  accident with loss of consciousness. (*Id.*) Dr. Gur also notes that "Schackart's behavior

17  meets criteria for a diagnosis of Schizophrenia, Paranoid Type, and his neurocognitive

18  performance indicates brain dysfunction that impairs important domains of behavior

19  including executive control and reasoning." (*Id.* at 10.)

20        Dr. Gur also explains that Schackart's symptoms of paranoia began in the early

21  1980s, followed by persecutory auditory hallucinations beginning in the late 1980s. (*Id.* at

22  9.) Schackart has been treated with antipsychotic medications since the 1990s. (*Id.*) Dr.

23  Gur believes that "[t]he early symptoms of paranoia, concerns about police following him,

24  mistaken identification of the victim, and sleeping with a knife under his mattress may

25  indeed have been early signs of schizophrenia indicating a prodromal [early onset] state of

26  the disorder." (*Id.*) It is common, Dr. Gur explains, "for such symptoms to manifest in an

27  attenuated form in the years before the full manifestations of the disorder develop." (*Id.*)

28  According to Dr. Gur, "In addition to organic damage or dysfunction, Mr. Schackart's

ongoing psychotic process is likely exacerbating the deficits observed, and also could very likely have contributed to both the misidentification of the victim as Mr. Schackart reported . . . and the flat affect he demonstrated in his demeanor at trial." (*Id.* at 9–10.)

Psychiatrist Dr. Raphael Morris evaluated Schackart and furnished a report on November 9, 2012. (Supp. Brief, Ex. 2.) Dr. Morris reviewed numerous records, including Schackart's previous mental health reports (*id.* at 2–4, 6–17), and conducted a mental status exam on July 10, 2010 (*id.* at 5, 25–27). Dr. Morris concludes that, prior to his evaluation, observation and treatment history established that Schackart suffers from Schizophrenia, Paranoid Type. (*Id.* at 4.) Dr. Morris states that "[a]lthough it is clear that [Schackart] continues to suffer from signs and symptoms of his mental illness, in exploring his history and the events leading up to his two arrests, there is evidence that he demonstrated a deteriorating clinical course in the year leading up to the murder and that at the time of the instant offense, he was suffering from florid psychotic symptoms due to his untreated mental illness." (*Id.*) Dr. Morris explains that the age of onset of Schackart's schizophrenia was consistent with epidemiological data, and that the trajectory of his illness is also consistent, presenting first with a prodromal phase with deteriorating social and occupational functioning. (*Id.*) Further, "[t]here is evidence that there was an escalation in his psychiatric illness over the course of the months leading up to the instant offense . . . and the onset of that illness is prior to his crimes and has persisted for many years following his arrests." (*Id.* at 5.) "[W]hile untreated, he was vulnerable to sabotaging his legal defense. What is also noteworthy is that in the context of an impaired insight into the extent of his illness, he was unable and unmotivated to present appropriate mitigating factors for the sentencing phase of his case." (*Id.* at 4–5.)

Dr. Morris further concludes:

> Mr. Schackart was already developing signs and symptoms of schizophrenia leading up to the instant offense and during the trial and sentencing phases, and was suffering under grandiose and paranoid thought content when he decided to try to defend himself and go pro se. His coherent speech and apparent intelligence complicated the court's ability to appreciate the severity of his illness and to consider that his decisions were being driven by

1   psychiatric conditions.

2   Also, complicating the court's perception of Mr. Schackart is the fact that he
3   has not displayed what we term a thought disorder, which means that he does
    not exhibit word salad or loosening of associations and his thought process
4   is not incoherent. . . . Therefore, the fact that he was coherent, able to review
    records and cross-examine witnesses did not take away from the fact that he
5   had developed schizophrenia in the early stages of his illness at the time of
6   his arrest and legal proceedings.

7   (*Id.* at 29.)

8       <u>C.    Prejudice</u>

9       Schackart asserts that had counsel diligently investigated his background, they

10  would have learned the information that was later developed by Dr. Morenz during state

11  postconviction proceedings about Schackart's family background and his spiral from

12  relative normalcy to his depressed, schizophrenic and psychotic state at the time of the

13  crime. (Doc. 131 at 27.) Schackart also asserts that had counsel conducted interviews of

14  people who knew him, including friends, teachers, military supervisors, employers,

15  neighbors, and family members for mitigation purposes, and hired a mitigation specialist

16  who is uniquely trained to discover mental health issues, they could have presented a

17  compelling case that Schackart was in the early stages of schizophrenia at the time of the

18  crime, which would have offered an explanation for why these crimes occurred. (Doc. 131

19  at 27.) However, as discussed next, Schackart could have corrected counsel's errors and

20  obtained this evidence himself, or, even if he could not, he was not prejudiced by trial

21  counsel's failure to develop this new evidence.

22      **1.  Schackart could have remedied trial counsel's failure to develop the**
23          **family-history and mental health evidence**

24      As previously discussed, the Court rejects Respondents' argument that *Cook*

25  forecloses the possibility of relief any time a defendant discharges counsel and proceeds

26  pro se. The Court must consider the specific circumstances of this case to determine

27  "whether Schackart, . . . could have remedied his trial counsel's failure to do anything to

28  perform the necessary mitigation investigation." (*See* Supp. Reply at 14.) Upon careful

1    review of the record and the evidence offered in these proceedings, the Court finds that,

2    even if trial counsel performed deficiently by failing to investigate mitigating evidence,

3    Schackart could have investigated and presented the evidence available at the time of his

4    sentencing.

5        Schackart alleges that several factors prevented him from correcting any errors in

6    counsels' performance. Relying on Stetler's affidavit, Schackart suggests that there are

7    "inherent difficulties" defendants who represent themselves face in attempting to develop

8    the kind of life history that must be done for an effective mitigation investigation: "too

9    young. . . too impaired. . . too traumatized. . . too ashamed. . ." (Supp. Brief at 38.)

10   Schackart also conclusively states that "the mitigation investigation and psychiatric

11   examination could not possibly have been done from a jail cell, in two months or less."

12   (Supp. Reply at 14–15; *see* Supp Brief at 38–39.) This argument has two components:

13   Schackart's custodial status and the amount of time he had to prepare his mitigation case.

14   The record in this case does not support a finding that these factors prevented Schackart

15   from presenting the evidence he now asserts should have been offered in mitigation.

16       Though Schackart was detained throughout the relevant period, he fails to explain

17   how his detention status impeded his ability to investigate or present the available

18   mitigating evidence offered here. The impediment is not self-evident; the trial court

19   appointed advisory counsel and they would have been available to assist Schackart with

20   any aspect of the investigation he may have had difficulty completing while in jail. (*See*

21   *e.g.*, ROA 684 (criminal subpoena for mitigation witness filed by advisory counsel)).

22       Nonetheless, Schackart asserts that "even with advisory counsel there was

23   insufficient time to conduct a mitigation investigation." (Supp. Reply at 16.) As discussed

24   above, the Court finds counsel performed deficiently by failing to conduct any significant

25   mitigation investigation before the guilt phase concluded. Nonetheless, the Court does not

26   address these claims in the abstract, but in the context of the evidence Schackart alleges

27   should have been presented. Considering that evidence, both the family dysfunction and

28   mental health evidence, the record indicates that Schackart "could have corrected those

errors once he decided to represent himself." *See Cook*, 688 F.3d at 609. The best evidence in support of this conclusion is that, despite his detention and with only five weeks to prepare, Schackart was able to present the testimony of seven acquaintances, as well as the testimony of Drs. Bendheim and Kartchner, at his mitigation hearing. (*See* RT 5/3/95.)

### a. Social History Evidence

In *Kayer v. Ryan*, the testifying experts explained that one rationale for beginning a mitigation investigation at the outset of a case is to "build trust and understanding" and "to establish a relationship with the client and attempt the process of collecting a life history." 923 F.3d 692, 714 (9th Cir. 2019) (citing *Strickland*, 466 U.S. at 688), *pet. rehearing and rehearing en banc denied*, 944 F.3d 1147, *judgment vacated on other grounds sub nom. Shinn v. Kayer*, 141 S. Ct. 517 (2020) (per curiam). But this rationale does not apply to a defendant who represents himself and is aware of his own life history.

Schackart points to no evidence supporting his contention that he could not have obtained the social-history evidence offered in this habeas proceeding. Schackart could have contacted his parents and asked them to testify at sentencing, but the record demonstrates Schackart did not want to call his parents as witnesses. Schackart explained to Dr. Morenz that he raped his ex-wife the day after he found out about his father being a cross-dresser. (December 2001 Report at 5.) Schackart's father had informed Schackart that he would probably lose his job if he revealed this information. (April 2001 Report at 3–4.) Rather than allow his attorneys to reveal this information about his background, Schackart chose to represent himself. (*See id.* at 3–4.) Schackart even opposed his counsel's request for a continuance of sentencing to allow them to call his parents as witnesses. (RT 5/3/85 at 198.) Schackart explained to the court that in regards to sentencing "I have my own views about it, they have different views about that. . . . [S]o why should they be representing me?" (RT 3/27/85 at 6.) The record demonstrates that Schackart was aware, and had been informed, that his parents were a potential source of mitigating evidence but chose not to pursue that evidence. Schackart cannot complain of prejudice from his own failure to pursue or present this evidence. *Cf. Cook*, 538 F.3d at 1016 (finding

1   no prejudice from pretrial counsel's alleged failure to uncover potentially impeaching

2   evidence when pro se defendant was aware of the evidence he could have used to impeach

3   a witness but chose not to present it).

4       Schackart also could have contacted his former acquaintances who have now

5   submitted declarations and could have obtained their testimony for use at sentencing or to

6   support a mental health evaluation. Schackart did present the testimony of several other

7   acquaintances at sentencing, including a former teacher and a commander who oversaw

8   Schackart's ROTC unit, demonstrating that he had the ability, while detained and in the

9   time he was allowed, to contact and obtain the testimony of such individuals.

10      Because Schackart "already knew much, if not all, of the information he now faults

11  his counsel for failing to develop," and could have corrected trial counsel's alleged failure

12  to investigate his family and acquaintances, he cannot claim he was denied effective

13  assistance of counsel. *See Cook*, 688 F.3d at 609–10, n.11 ("[E]ven if he was not

14  completely aware of the mental impairments he now alleges he had at the time he

15  committed the murders, he plainly was aware of his own troubled childhood and

16  adolescence.").

17              *b.   Mental Health Evidence*

18      Schackart asserts that he "did do what he could" by seeking a psychiatric evaluation

19  for purposes of the aggravation/mitigation hearing but the trial court denied his request.

20  (Supp. Reply at 15 (citing RT 4/22/85).) This is only partially correct.

21      The trial court granted Schackart's motion for psychiatric examination for the

22  purpose of presenting expert testimony at the sentencing hearing. (RT 4/22/85 at 70–72;

23  ROA 791) Dr. Bendheim performed an additional mental health evaluation of Schackart

24  before the mitigation hearing and presented his findings at the hearing. (RT 5/3/95 at 52.)

25  These facts bely Schackart's allegation that he had "insufficient time" to conduct a mental

26  health evaluation.

27      Rather, Schackart's failure to obtain a neuropsychological exam is attributable to

28  the limitations he placed on his investigation based on his sentencing strategy. "A

defendant's decision to limit a mitigation defense," will be sustained on review if the defendant's waiver comports with due process. *Summerlin*, 427 F.3d at 639 (citing *Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993)). Though the court limited the scope of the psychiatric evaluation (*see* ROA 791), Schackart's request for a mental health examination prior to his original sentence specifically stated that the requested exam was to be limited to determining the existence of specific statutory mitigating factors. (ROA 663–64.) The motion was granted to allow examination with respect to three factors, including "whether the defendant was under some unusual and substantial distress as a result of some other mental disorder," and whether there were any psychological factors present at the time of the offense which would tend to make the defendant less culpable of the offense. (RT 4/22/85 at 72–73.) As previously determined, Schackart "has not asserted and, after a review of the record, the Court is not aware of the trial court restricting [Schackart's] presentation of any mitigation at the aggravation/mitigation hearing prior to his original sentence." (Doc. 75 at 49.) Schackart could have, but did not, request the psychiatric evaluations performed here. "[Schackart] makes much of the trial court's appointment of Dr. Bendheim for only limited purposes regarding mitigation, but it was [Schackart] that requested limited assistance. (*See* ROA 663–64.) He got exactly the assistance he requested." (Doc. 75 at 52.)

Moreover, Dr. Gur's results regarding Schackart's alleged brain dysfunction are not dependent on the development of the family-history evidence that Schackart now claims could have been investigated before sentencing. Dr. Gur relies primarily on the results from Schackart's neuropsychological testing to establish the presence of a brain dysfunction, which Dr. Gur opined was "developmental" and impacted by the effects of a forceps delivery and a motorcycle accident causing loss of consciousness. (Supp. Brief, Ex. 1 at 9.) Though Dr. Gur relied on Schackart's self-reporting of his forceps birth and motorcycle accident to establish that Schackart's neurodevelopmental deficiencies were impacted by additional head trauma, he did not rely on these reports to establish the diagnosis of brain dysfunction. Further, Dr. Gur explained that the "neuropsychological assessment tools that

[he] administered and factored into the quantitative analysis of behavioral findings were available" in 1985 and 1993. Had Schackart wanted a neuropsychological examination such as that performed by Dr. Gur, he could have requested one.

Thus, the Court concludes, Schackart could have corrected the alleged errors of trial counsel in failing to perform neurocognitive testing once he decided to represent himself. By requesting a limited psychiatric examination, however, Schackart foreclosed that possibility and may not now claim that he was prejudiced by counsel's failure to conduct a mitigation investigation. *See Cook*, 688 F.3d at 609. Nor can this Court speculate as to whether Schackart would have been allowed the time or resources to develop this kind of mitigating evidence since he did not make the request.

Despite his detention, Schackart was able to present the testimony of seven acquaintances and the expert testimony of Drs. Bendheim and Kartchner at his mitigation hearing. (*See* RT 5/3/95.) In sum, the record demonstrates that nothing but Schackart's own choice of strategy prevented him from correcting the sentencing stage errors of trial counsel. *See Cook*, 688 F.3d at 609 n.12.

## 2. There is no reasonable probability the new evidence would have altered the outcome at sentencing

Alternatively, even if Schackart was unable to correct trial counsel's errors, he cannot show prejudice as a result. To assess prejudice from counsel's performance at the sentencing stage of a capital case, a court considers the totality of the mitigating evidence and weighs it against the aggravating factors. *Wiggins*, 539 U.S. at 534. This Court, after performing such an assessment of Schackart's mitigating evidence, including the evidence raised during his PCR proceedings and this habeas proceeding, concludes that Schackart was not prejudiced by counsel's failure to present additional information at sentencing.

### a. The new evidence would have conflicted with Schackart's trial strategy.

The new mental health evidence presented here would have conflicted with Schackart's mitigation strategy. Schackart's strategy was to show that he was a promising,

high-achieving young man, who committed an out-of-character act because he was under stress from the situation with his ex-wife. This strategy was in accord with Dr. Bendheim's contemporaneous report stating: "[I]t is quite obvious that we are dealing with an acute emotional disturbance in a person who was extremely vulnerable toward that sort of thing." (Doc. 141-1, Ex. C, Bendheim Report at 24.) Schackart presented a mitigation case that supported this theory. He did not want to call either of his parents to testify, and counsel's desire to pursue his parents as a source of mitigating material was a point of contention between counsel and Schackart. (RT 5/3/85 at 198.)

Further, although Schackart's father now avows that he would have participated in an interview with trial counsel Karen Noble if she had granted his request to have a pastor present, the defense had attempted unsuccessfully to subpoena Schackart's parents at the time and the father "made threats that if subpoenaed he would do everything he could to hurt Mr. Schackart." (*Id.*; ROA 799–800) The second pre-sentence report also relates that the probation officer made several attempts to contact Schackart's parents but was unsuccessful. (Supp. Response, Ex. B at 4.) There is no indication that a mitigation specialist would have been any more successful in contacting Schackart's father and getting information from him than the defense investigator or the probation officer.

To the extent Schackart's acquaintances could have testified that his home life was unusual and alienating (*see* Supp. Brief, Ex. 6 at 1), that he needed mental health treatment (*see id.* Ex. 5 at 1, Ex. 6 at 2, Ex. 7 at 2) or that he was odd, unstable, or had a dissociative and paranoid mental disorder (*see id.* Ex. 7 at 1–2), such testimony would have undermined Schackart's mitigation case, and the record demonstrates that he would not have presented such evidence in any case.

Schackart's mitigation theory was to present positive evidence of his character. This strategy would have been undermined by evidence of long-term mental disease and brain damage. *See, e.g.*, *Truesdale v. Moore*, 142 F.3d 749, 754 (4th Cir. 1998) (counsel exercised reasonable strategic judgment by "steer[ing] away from" evidence of organic brain dysfunction, "calculating that it would not help portray [the petitioner] as normal and

capable of rehabilitation"); *Cannon v. Gibson*, 259 F.3d 1253, 1277–78 (10th Cir. 2001) (omitted mitigation information of "serious brain damage" and lack of impulse control would have displaced mitigation information portraying the petitioner as a "kind, compliant, and responsible individual whose involvement in the murder was an aberration"). Further, Schackart knew about the two incidents that could have contributed to his brain dysfunction, as he reported both the forceps delivery and the motorcycle accident to Dr. Gur, but failed to pursue them as part of his theory of mitigation.

> b. *The diagnosis of schizophrenia is based in part on evidence unavailable before sentencing.*

Schackart asserts that the diagnosis of schizophrenia which has now been made, could have been developed at the time of Schackart's trial had counsel performed an adequate mitigation investigation. The Court disagrees. Schackart's medical records from the Department of Corrections laid the foundation for Dr. Morenz's initial diagnosis of schizophrenia, (*see* Morenz's April 2001 Report at 1). Dr. Gur subsequently relied on Dr. Morenz's conclusions as well as the prison medical records in reaching his diagnosis of schizophrenia.  Those records did not exist at the time of sentencing. Thus, counsel cannot be faulted for failing to obtain them, nor can Schackart demonstrate prejudice from the conclusions in his expert's reports that rely on them.

> c. *The new evidence is, in part, cumulative to the evidence presented at sentencing.*

To the extent Schackart's acquaintances would have testified about Schackart's positive attributes, such evidence is cumulative and internally inconsistent. Schackart presented the testimony of five other acquaintances at sentencing, all of whom had positive things to say about him. (*See* RT 3/5/85 at 16, 120–21, 135–36, 145–46, 151–52.) The largely cumulative nature of the evidence offered about Schackart's background diminishes the likelihood of prejudice. *See Wong v. Belmontes*, 558 U.S. 15, 22–23 (2009) (finding no prejudice where additional evidence was cumulative to that presented at trial); *Leavitt v. Arave*, 646 F.3d 605, 615 (9th Cir. 2011) ("[C]umulative evidence is given less

weight because it is not as likely to have affected the outcome of the sentencing."); *Rhoades v. Henry*, 638 F.3d 1027, 1051 (9th Cir. 2011) (finding no prejudice despite the fact that new evidence "exceed[ed] what was uncovered and presented by trial counsel" in part because "much of the newly adduced evidence [wa]s cumulative").

Additionally, the new declarations are somewhat inconsistent with each other. For example, Schackart's teacher Campbell describes Schackart as a "model student" with good behavior and citizenship" and "excellent social behavior," (Doc. 131-1, Ex. 5 at 1), while Witbeck describes him as living "a totally different life from other kids," perceived as "lacking in social skills" (*Id.*, Ex. 6 at 1) and Cannon described him as "somewhat unstable" with some "profound" "breaks from reality," though he also stated he was "active in school, a great worker, and a dynamo" (*Id.*, Ex. 7 at 1).

Accordingly, the three new lay declarations would not have significantly altered the sentencing profile presented to the sentencing judge. *See Strickland*, 466 U.S. at 699-700; *see also Schurz v. Ryan*, 730 F.3d 812, 815 (9th Cir. 2013) (explaining that most of the new evidence was cumulative, unsubstantiated, "minimally relevant at best," and "so speculative that it comes nowhere close to showing deficient performance.").

### d. The new evidence was contradictory, speculative and directly contradicted by contemporaneous reports.

The new retrospective diagnoses of schizophrenia and brain damage carry little weight given the contemporaneous reports available at the time. *See Earp v. Cullen*, 623 F.3d 1065, 1076 (9th Cir. 2010) (diagnosis of brain damage received 11 years after trial is insufficient to overcome the reports at the time of trial indicating that petitioner did not have brain damage).

Schackart asserts that if he had obtained "the necessary full mental and neurological evaluations, which would have encompassed organic brain damage," such evidence would have confirmed that he "was in the prodromal phase of schizophrenia at the time of the crime." (Supp. Brief at 32.) This assertion is highly speculative. Though Dr. Gur concludes, after examining Schackart in 2012, that Schackart's "current evaluation of behavior meets

the criteria for a diagnosis of Schizophrenia, Paranoid Type," he also explains that it is "common for symptoms such as Schackart's early symptoms of paranoia to manifest in an attenuated form in the years before the full manifestations of the disorder develops." (Supp. Brief, Ex. A at 9, 10.) Dr. Gur notes that Schackart reported only "possible early symptoms during the time of murder, which included a visual hallucination in which he mistook the victim for his wife." (*Id.* at 9.) This "possible early symptom," however, was discredited by Dr. Bendheim in 1984. Dr. Bendheim addressed this possible dissociative reaction in his report, concluding Schackart's misidentification of the victim, mistaking her for his wife, though possibly delusional, was "bizarre," and such "a dissociative reaction, coming and going in rapid succession, is not a very convincing story." (PCR ROA 166, Ex. 19 at 25; *see* RT 5/3/85 at 72 ("If that was disorientation, it was indeed very unusual because it went back and forth, it waned and waxed.")) Dr. Bendheim's contemporaneous report indicated, contrary to the later opinion of Dr. Gur, "no other evidence of delusions or hallucinations. . . . [or] evidence of serious illusions or difficulties with reality testing" as might be expected from someone in the prodromal phase of schizophrenia. (*See id.* at 21.) Rather, as Dr. Bendheim testified, Schackart was "impulsive" and would try "to keep it all within and then would explode at an inopportune moment." (RT 3/15/85 at 23.)

Dr. Gur addresses Schackart's other early symptoms of paranoia, such as "concerns about police following him, mistaken identification of the victim, and sleeping with a knife under the mattress," and opines that it is "often only in retrospect" that these "early signs of schizophrenia" can be linked to a subsequent diagnosis of schizophrenia. (Supp. Brief, Ex. 1 at 9.) It is highly speculative that a diagnosis of schizophrenia, even in the prodromal state, would have been made at the time of sentencing. To support his findings, Dr. Gur relied on "a psychiatric history . . . remarkable for a diagnosis of schizophrenia with symptoms of paranoia beginning in the early 1980s, followed by persecutory auditory hallucinations beginning in the late 1980s.". (*See id.* at 1–2, 9.) The Court concludes, after a careful review of Dr. Gur's "Relevant Record Review," that the psychiatric history he is referring to is Dr. Morenz's April 2001 Report, which Dr. Gur summarizes as "present[ing]

1   evidence that Mr. Schackart appeared to be developing schizophrenia in 1983" (*id.* at 1),

2   and medical records from the Arizona Department of Corrections, indicating a diagnosis

3   of "Schizophrenia, Paranoid," on June 8, 1993 (*id.* at 2). These reports were not available

4   at the time of Schackart's mitigation hearing in 1985.

5        Even if Schackart had been diagnosed with schizophrenia in 1985, the Court finds

6   it unlikely that the diagnosis would have been accorded much weight by the sentencer as

7   direct mitigation or as an explanation for Schackart's "remorseless behavior and cavalier

8   attitude toward the trial proceedings" (*see* Doc. 131-1 at 27), given the contemporaneous

9   reports from Dr. Cleary and the records from SAMHC. Dr. Cleary, in his report dated

10   February 22, 1985, gave Schackart "no psychiatric diagnosis" and found "no indication . . .

11   that he suffered at [the time of the offense] from any mental illness, defect, or disorder . . .

12   [or] that he ever suffered from a psychosis or major mental disorder." (Supp. Response,

13   Ex. C, Clearly Report at 5; RT 3/16/85 at 17.) Additionally, Dr. Bendheim's report

14   indicates Schackart was treated at SAMHC from February 1, 1984, to March 8, 1984. Dr.

15   Bendheim's summary of the SAMHC reports indicates Schackart was diagnosed with an

16   adjustment disorder with depressed mood and compulsive personality, but not psychosis,

17   and no mention is made of a possible diagnosis of schizophrenia or paranoia. (PCR ROA

18   166, Ex. 19 at 15.) These contemporaneous reports cast doubt on Schackart's retrospective

19   claims of mental illness.

20        Additionally, the import of Dr. Gur's opinion, that Schackart's "neurocognitive

21   performance indicates brain dysfunction that impairs important domains of behavior

22   including executive control and reasoning," (s*ee* Supp. Brief, Ex. 1 at 10), is of little more

23   mitigating value than Dr. Bendheim's conclusion at the mitigation hearing that Schackart:

24   (1) was significantly impaired at the time of the crime; (2) did not intend to kill Charla and

25   did not foresee her death; (3) had "persecutory ideas"; (4) had "depressive neurosis"; (5)

26   was confused in his understanding that the victim was his wife; and (6) was an impulsive

27   person. (RT 5/3/85 at 53–61.)

28        To the extent the new brain damage evidence shows impulsivity, Schackart had

already presented such evidence at sentencing and the court specifically found that impulsivity was a mitigating circumstance. (RT 12/7/93 at 28; Resentencing ROA at 113.) Additionally, having reported "no history of head injury" to Dr. Cleary, Schackart's later, inconsistent claims of head injury, would lack credibility. *Cf. Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J, concurring) (noting exonerating affidavits made many years after trial "are to be treated with a fair degree of skepticism.").

Additionally, Dr. Gur's opinion that Schackart's neurological deficits were "developmental in nature" (Doc. 131-1, Ex. 1, Dr. Gur's Report, at 9) would have lacked credibility because this opinion was in contrast with ample evidence that in school Schackart had above average intelligence and had been on the honor roll, (*see id.*, Ex. 2, Dr. Morris's Report at 6–7), was "extremely bright and a model student," (*see id.*, Ex. 5, Lawrence Declaration, at 1), "brilliant" even, (see id., Ex. 7 (Cannon Declaration) at 1), and, at the time of the crime, was "of better than average intelligence" (Doc. 141-1, Ex. C (Bendheim Report) at 21). In addition to his raw intelligence, there is also ample evidence in the record, in the form of Schackart's many youthful accomplishments, recognized by the trial court, that would have contradicted Dr. Gur's opinion that Schackart's brain dysfunction specifically "impairs important domains of behavior including executive control and reasoning." (Doc. 131-1, Ex. 1 at 10.)

The PCR court's ruling on Schackart's claim that appellate counsel was ineffective for failing to raise an *Ake* claim on appeal supports this Court's conclusion that the additional mental health evidence is insufficient to establish prejudice. In ruling on the claim, the PCR court considered the possibility that, according to Dr. Morenz, Schackart suffered from schizophrenia, and "may have been experiencing considerable emotional turmoil and psychosis" in 1983 and 1984. (PCR ROA 185 at 20.) The PCR court concluded, as does this Court, that nothing in those reports adds significantly to the evidence presented at sentencing. (*Id.*) "That Dr. Morenz, 17 years after the original aggravation/mitigation hearing, may have a different view from Dr. Bendheim, or additional explanations for defendant's conduct" is insufficient to "warrant the relief he

requests." (*Id.*)

Schackart was not prejudiced by counsel's failure to investigate additional social history or mental health evidence. The difference between the evidence that was presented and the evidence that could have been presented is insufficient to undermine confidence in the outcome of the sentencing proceedings. *Duncan*, 528 F.3d at 1240; *see also Atwood*, 870 F.3d at 1064; *Runningeagle*, 825 F.3d at 988. There was not a reasonable probability that Schackart would have received a life sentence if the evidence had been presented. *Strickland*, 466 U.S. at 693.

PCR counsel, in turn, did not perform ineffectively by failing to raise this claim. *See Atwood*, 870 F.3d at 1060 ("If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it."); *Runningeagle*, 825 F.3d at 982 (explaining that to find prejudice based on PCR counsel's failure to raise a trial-level ineffective assistance of counsel claim, the court "must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised"). There is no reasonable probability that the results of the PCR proceedings would have been different if counsel had raised this claim. Schackart therefore cannot show "cause" under *Martinez* for the claim's default. Claim 6(b) remains procedurally defaulted and barred from federal review.

## VI.   EVIDENTIARY DEVELOPMENT

Finally, Schackart seeks discovery, expansion of the record, and an evidentiary hearing. (Supp. Brief at 53–61.)

In *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Supreme Court held that where the state court has denied a habeas petitioner's claim under 28 U.S.C. § 2254(d), review by the federal court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 181. However, where a state court has not adjudicated the merits of a claim because of a procedural bar, a district court may consider new evidence in determining whether the petitioner can overcome that bar. *See Dickens*, 740 F.3d at 1321 (holding that *Pinholster* did not bar petitioner from presenting new evidence to support a

cause-and-prejudice argument under *Martinez* because *Pinholster* applies only to claims previously "adjudicated on the merits in State court proceedings"); *Detrich*, 740 F.3d at 1246–47 ("*Pinholster*'s predicates are absent in the context of a procedurally defaulted claim in a *Martinez* case.").

In *Dickens* the court also rejected the argument that 28 U.S.C. § 2254(e)(2) barred evidentiary development in federal court, explaining that a petitioner seeking to show "cause" under *Martinez* is not asserting a "claim."[19] 740 F.3d at 1321. ("A federal court's determination of whether a habeas petitioner has demonstrated cause and prejudice . . . is not the same as a hearing on a constitutional claim for habeas relief."); *see Woods*, 764 F.3d at 1138 n.16 (explaining that neither *Pinholster* nor § 2254(e)(2) "categorically bar [a petitioner] from obtaining such a hearing or from presenting extra-record evidence to establish cause and prejudice for the procedural default. . . .").

Accordingly, contrary to Respondents' argument (*see* Supp. Response at 5), in carrying out its analysis under *Martinez*, the Court will consider the entirety of the record, including the new evidence developed by Schackart during these habeas proceedings (Doc. 131-1, Supplemental Exhibits 1–9) in support of the defaulted claims. *See Dickens*, 740 F.3d at 1321.

Schackart seeks formal discovery, specifically requesting authorization to depose his trial, resentencing, and PCR counsel, as well as healthcare providers in Illinois and Arizona who can present records of Schackart's birth trauma and motorcycle accident.

A habeas petitioner is not entitled to formal discovery "as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rule 6 of the Rules Governing Section 2254 Cases provides that "[a] judge may, for good cause, authorize a party to conduct discovery." R. 6(a), Rules Governing Sec. 2254 Cases in the U.S. Dist. Cts. (2010).

---

[19] Twenty-eight U.S.C. § 2254(e)(2) severely limits the circumstances in which a federal habeas court may hold an evidentiary hearing on claims not developed in state court.

"[A] district court abuse[s] its discretion in not ordering Rule 6(a) discovery when discovery [i]s 'essential' for the habeas petitioner to 'develop fully' his underlying claim." *Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (quoting *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997)). However, courts should not allow a petitioner to "use federal discovery for fishing expeditions to investigate mere speculation." *Calderon v. U.S. Dist. Ct. for the N. Dist. of Cal. (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see also Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (recognizing that habeas corpus "was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence.'") (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).

Whether a petitioner has established "good cause" for discovery under Rule 6(a) requires a court to determine the essential elements of the petitioner's substantive claim and evaluate whether "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

Schackart fails to show good cause for the requested discovery. The record is sufficient for the Court to carry out its analysis of the remanded claim. Additional evidence is unnecessary with respect to allegations that trial counsel performed ineffectively by failing to request a mitigation specialist or investigate relevant mitigating evidence or that PCR counsel performed ineffectively by failing to raise a claim of ineffective assistance of trial counsel. As discussed above, the Court presumes that counsel in both instances performed deficiently. The Court declines, however, to find prejudice from these failures, or that Schackart could not have corrected his trial counsel's errors. Thus, there is no good cause to allow Schackart to depose his counsel in support of this claim.

The record provides sufficient evidence for the Court to undertake its analysis under *Martinez* and *Dickens*. *See Phillips v. Ornoski*, 673 F.3d 1168, 1179 (9th Cir. 2012) (explaining that a court has the discretion to deny an evidentiary hearing where the documentary evidence is sufficient to decide the issue); *Runningeagle*, 825 F.3d at 990 (concluding that the district court did not abuse its discretion in denying an evidentiary

hearing where "[t]he expanded record included the declarations of witnesses who would testify at a live hearing, and [the petitioner] made no showing that their testimony would differ materially from their declarations"); *Williams (Stanley) v. Woodford*, 384 F.3d 567, 591 (9th Cir. 2004) (explaining that "oral testimony and cross-examination were not necessary because the documentary evidence submitted fully presented the relevant facts"). Moreover, to the extent Schackart seeks formal discovery of his own medical records, they should be available to him without the need for a court order.

Finally, Schackart seeks an evidentiary hearing on the remanded claim and all allegations of cause under *Martinez*. (Supp. Brief at 59–61.) Again, the record provides sufficient evidence for the Court to undertake its analysis under *Martinez* and *Dickens*. *See Phillips*, 673 F.3d at 1179. As discussed above, the Court need not consider the new mitigating circumstances developed in these proceedings because it finds that Schackart could have developed that evidence after deciding to represent himself but chose not to.

Schackart also asserts an evidentiary hearing is the only sure way "to determine the facts about [his] paranoid schizophrenia," specifically "its likely impact on [his] affect, which was so negatively perceived by the court, . . . whether Drs. Gur and Morris are correct about [his] brain dysfunction," and "whether any such brain dysfunction had a likely impact upon [his] ability to control [his] emotions and to be in reality at the time of the crime, or to, in fact, have mistaken the victim for his ex-wife." (Supp. Brief at 60.) Schackart asserts that an evidentiary hearing is also the only reliable way in which the Court may "truly become informed about the many facets of [his] personal and family life history, school, employment and military experiences, and other events that shaped him and made him who he was at the time of the crime."  (Doc. 131 at 61.)

For purposes of reviewing Schackart's remanded claim, however, the Court assumes the testimony of witnesses at a hearing would be consistent with their declarations or reports. Schackart does not identify what additional evidence or witnesses would be presented at a hearing, nor does he suggest how that testimony would differ from the contents of the reports and declarations in the expanded record. *See Hooper*, 985 F.3d at

632–33; *Runningeagle*, 825 F.3d at 990; *Williams (Stanley)*, 384 F.3d at 591.

## VII.   CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate the Court's application of *Martinez* in its analysis of Claim 6(b).

## VIII.   CONCLUSION

For the reasons stated above, the default of Claim 6(B) is not excused under *Martinez*. The claims remain defaulted and barred from federal review.

**Accordingly**,

**IT IS HEREBY ORDERED** as set forth above that Schackart is not entitled to relief on the remanded claim.

**IT IS FURTHER ORDERED** granting Schackart's request to expand the record. The record is expanded to include Exhibits 1 through 9 (Doc. 131-1.) Schackart's requests for discovery and an evidentiary hearing are denied.

1    **IT IS FURTHER ORDERED** granting a Certificate of Appealability as to Claim
2    6(b).

3    **IT IS FURTHER ORDERED** that Petitioner's Amended Petition for Writ of
4    Habeas Corpus (Doc. 39) is DENIED. The Clerk of Court shall enter judgment
5    accordingly.

6    Dated this 28th day of March, 2022.

Honorable David C. Bury
United States District Judge